**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Earl Calvin HANDFIELD,**
**II, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 4, 2011.

Filed Dec. 14, 2011.

Sheryl J.M. Wilson, West Chester, for appellant.

Gerald P. Morano, Assistant District Attorney, West Chester, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., and GANTMAN, J.

OPINION BY STEVENS, P.J.:

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Chester County following Appellant's conviction by a jury on the charges of first-degree murder, 18 Pa.C.S.A. § 2502(a), and possessing instruments of crime, 18 Pa.C.S.A. § 907(a). Appellant contends (1) the trial court erred in denying Appellant's motion to dismiss on the basis the Commonwealth met its burden of proving it did not "use or derivatively use" Appellant's immunized grand jury testimony, (2) the trial court erred in permitting defense witness Ataya Shabazz to testify on cross-examination as to prior consistent statements made by Commonwealth witness Adrienne Beckett, and (3) the trial court erred in limiting Appellant's cross-examination of Commonwealth witness David Johnson. We affirm.

The relevant facts and procedural history are as follows: During the evening of October 19, 2005, in an alley in the city of Coatesville, Pennsylvania, Charles Corey "Peen" Jennings was shot and killed. During the investigation, on October 26, 2006, the Commonwealth subpoenaed Ap-

pellant to testify before the thirteenth investigating grand jury. Appellant appeared before the grand jury; however, he invoked his Fifth Amendment privilege against compulsory self-incrimination.

On November 16, 2006, the Commonwealth obtained an order compelling Appellant to appear before the grand jury under the grant of immunity. Thus, on that same date, Appellant again appeared before the thirteenth investigating grand jury and, while testifying about the death of Mr. Jennings, Appellant implicated himself in the murder.

On November 24, 2007, the police arrested Appellant, who filed a counseled motion seeking to dismiss the prosecution under the auspices of *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and its progeny. The Commonwealth filed a reply in opposition to the motion to dismiss, and the trial court held numerous evidentiary hearings on the matter at which several police officers and members of the Chester County District Attorney's Office testified. For instance, Assistant District Attorney Peter Hobart confirmed Appellant had received immunity before the thirteenth investigating grand jury and, on November 16, 2006, ADA Hobart examined Appellant before the grand jury. N.T. 3/12/08 at 40. At the conclusion of Appellant's grand jury testimony, in which Appellant implicated himself as the shooter, ADA Hobart, accompanied by Detective Kevin Campbell, so informed his supervisor, Deputy District Attorney Steve Kelly, who in turn informed District Attorney Joseph Carroll regarding the substance of what had transpired during Appellant's grand jury testimony. N.T. 3/12/08 at 40–41, 52. DA Carroll ordered ADA Hobart and Deputy DA Kelly not to discuss the circumstances of the case with anyone, and ADA Hobart specifically testified he never violated this order. N.T. 3/12/08 at 41. ADA Hobart testified he was not involved in the decision to charge Appellant with the murder of Mr. Jennings, he did not assist in the investigation of Mr. Jennings' homicide after November 16, 2006, and he "remained silent as to the contents of [Appellant's] immunized testimony." N.T. 3/12/08 at 43.

On cross-examination, ADA Hobart testified that, prior to examining Appellant before the grand jury, Detective Campbell told ADA Hobart that Appellant and David Johnson were both present during Mr. Jennings' homicide. N.T. 3/12/08 at 45. Additionally, Detective Campbell told ADA Hobart Mr. Jennings had stolen Appellant's chain prior to this death and, on the date of the shooting, there was an altercation between Mr. Jennings, Appellant, and Mr. Johnson. N.T. 3/12/08 at 45. ADA Hobart admitted he was "surprised" by the testimony he elicited from Appellant before the grand jury. N.T. 3/12/08 at 52.

Assistant District Attorney Thomas Ost–Prisco testified that, in late November of 2006, Deputy DA Kelly reassigned him to Mr. Jennings' homicide. N.T. 3/12/08 at 65. He was not given a specific reason as to why the case was assigned to him; however, he was specifically instructed that he could not discuss the case with Deputy DA Kelly, Deputy DA Ron Yen, Detective Campbell, ADA Hobart or DA Carroll. N.T. 3/12/08 at 66. ADA Ost–Prisco testified he did not violate the instruction. N.T. 3/12/08 at 67. He indicated he did not have much information when the case was assigned to him; however, he was told that he could speak to Detective Marty Quinn, Detective Kevin Dykes, Chief Albert DiGiacamo, and Detective Frank Martin. N.T. 3/12/08 at 67. ADA Ost–Prisco was aware Appellant's girlfriend, Adrienne Beckett, had testified before the grand jury and he reviewed her

grand jury testimony in its entirety. N.T. 3/12/08 at 69. ADA Ost–Prisco did not review any other testimony from the thirteenth investigating grand jury. N.T. 3/12/08 at 69.

ADA Ost–Prisco indicated he was going to be prosecuting Appellant, and he summarized the evidence, which he intended to present at Appellant's trial. For instance, he intended to call as a witness Mr. Johnson, who began cooperating with the police in January or February of 2007. N.T. 3/12/08 at 74. Mr. Johnson gave the police a detailed statement of what occurred on the night of Mr. Jennings' murder, including the fact Appellant shot Mr. Jennings multiple times. N.T. 3/12/08 at 74.

Mr. Johnson's cooperation led to his girlfriend, Ataya Shabazz, wearing a body wire to record a conversation she had with Adrienne Beckett, which in turn led to Ms. Beckett giving the police a statement in March of 2007. N.T. 3/12/08 at 74. ADA Ost–Prisco intended to call Ms. Beckett as a witness so that she could testify consistently with her March of 2007 statement. In her statement, Ms. Beckett indicated that Mr. Jennings had stolen a gold chain from Appellant, and, after the murder, Appellant told Ms. Beckett he "did what [he] had to do." N.T. 3/12/08 at 71. Additionally, she informed the police that, a few hours after the homicide, she drove with Appellant to Maryland, where she watched as Appellant dumped a plastic shopping bag into a dumpster in a parking lot behind a strip mall. N.T. 3/12/08 at 72.

ADA Ost–Prisco further intended to call as witnesses Dante Carter, Francis Washington, and Duron Peoples, all of whom would testify about Mr. Jennings taking Appellant's gold chain, as well as investigating police officers and the medical examiner who performed the autopsy of Mr. Jennings. · N.T. 3/12/08 at 75.

On cross-examination, ADA Ost–Prisco testified he sought to secure Wendell Fields' testimony before the investigating grand jury and Deputy DA Kelly was not involved in the matter. N.T. 3/12/08 at 79–80. ADA Ost–Prisco explained that, before he was assigned to prosecute the homicide of Mr. Jennings, Mr. Fields had given a statement to the police indicating that, the day after the murder, Mr. Fields had breakfast with Appellant, who informed him Mr. Johnson had shot Mr. Jennings. N.T. 3/12/08 at 94. ADA Ost–Prisco further explained Mr. Fields' statement was the "beginning point" of his investigation and he was "looking at [Mr.] Johnson as being the possible shooter." N.T. 3/12/08 at 97. That is, at the time ADA Ost–Prisco was assigned to handle the case, which was after Appellant had implicated himself before the grand jury, he was not specifically looking at Appellant as the shooter. N.T. 3/12/08 at 97. However, ADA Ost–Prisco later concluded Mr. Fields was lying about Appellant's claims of innocence based on subsequent statements made by Kurtis Allen and Daryl Buchanan. N.T. 3/12/08 at 94. Specifically, Mr. Allen told authorities that, while he was incarcerated in the Chester County Prison, he spoke to Mr. Fields, who told him Appellant had confessed to him that he shot Mr. Jennings and Mr. Fields concocted a story to deflect the blame onto Mr. Johnson. N.T. 3/12/08 at 94–95. Additionally, following the interview with Mr. Allen, the police interviewed Mr. Buchanan, who reported that, after the homicide, Mr. Fields told Mr. Buchanan Appellant had killed Mr. Jennings. N.T. 3/12/08 at 96.

ADA Ost–Prisco admitted he entered into negotiations with Mr. Johnson as to an unrelated case in order to "get him to talk" about the shooting of Mr. Jennings. N.T. 3/12/08 at 87–89. At this point, ADA Ost–Prisco was "still operating under the assumption that [Mr. Johnson] might have

been the shooter [, ... and] [i]t was only after [the police] got to Ms. Beckett, with Mr. Johnson's help, that [ADA Ost–Prisco] felt a lot more comfortable talking to Mr. Johnson." N.T. 3/12/08 at 88. In February or March of 2007, after speaking with Ms. Beckett and Mr. Johnson, he concluded Appellant shot Mr. Jennings. N.T. 3/12/08 at 87.

ADA Ost–Prisco admitted that, while he was never specifically advised Appellant offered immunized grand jury testimony, it was an assumption he formed shortly after he was assigned to handle Mr. Jennings' homicide. N.T. 3/12/08 at 81. ADA Ost–Prisco first learned definitively that Appellant offered immunized grand jury testimony when he read a newspaper article, which discussed Appellant's motion to dismiss. N.T. 3/12/08 at 122–23.

As to what investigative action the district attorney's office took after Appellant implicated himself during his immunized testimony before the grand jury, ADA Ost–Prisco specifically testified as follows on cross-examination:

> [Defense counsel,] you ... [are] assuming that we took the focus off of Mr. Johnson and focused solely on [Appellant]. That's not the case. I was still focused on Johnson. I didn't know what Ms. Beckett was going to give me. For all I know, the testimony that was going to be produced was that while [Appellant] was there, he may have been involved in an assault. Johnson was still the shooter. I don't know what he said before the grand jury. I never found out. I don't want to find out today. But at the time I didn't know what happened, so we were still thinking that Johnson was the shooter. So, the focus didn't change from Johnson to [Appellant]. The focus was on both of them.

N.T. 3/12/08 at 99.

Chester County Detective Kevin Dykes testified that, on October 20, 2005, the day after Mr. Jennings was killed, he was assigned to investigate the homicide and, as of the date of the hearing, he was still actively involved in the investigation. N.T. 3/12/08 at 145. Detective Dykes was involved in the thirteenth grand jury's investigation into Mr. Jennings' homicide, and more specifically, it was his role to conduct interviews of possible witnesses. N.T. 3/12/08 at 146. Regarding transcripts from the grand jury, Ms. Beckett's transcript was the only one reviewed by Detective Dykes. N.T. 3/12/08 at 146. He specifically testified that, aside from Ms. Beckett's testimony, he was unaware of any other information stemming from the grand jury's investigation of Mr. Jennings' homicide. N.T. 3/12/08 at 147. Regarding Appellant's involvement with the grand jury, the relevant exchange occurred during Detective Dykes' direct examination:

> Q: Did you serve any subpoenas for the Jennings investigation?
>
> A: Yes, I did.
>
> Q: Do you recall who you served?
>
> A: Yes.
>
> Q: Who did you serve?
>
> A: I served [Appellant] via his attorney's office[.] I served him on October 20th of 2006 and Adrienne Beckett.
>
> Q: Do you know whether [Appellant] did, in fact, testify?
>
> A: No, I don't.
>
> Q: At some point, were you given any instructions concerning individuals involved with the thirteenth grand jury?
>
> A: Yes.
>
> Q: What were those instructions?
>
> A: I was instructed by my chief, Chief Albert DiGiacamo, and District Attorney Joseph Carroll that from that point forward, I was no longer to discuss the

Jennings homicide with anyone who was involved with the grand jury.

Q: Do you recall when those instructions were given to you?

A: [S]ometime around November of '06.

Q: Were you told the reason as to why?

A: No.

Q: Did you ever violate those instructions?

A: No, I did not.

Q: As of what date did you stop your communications with those individuals identified?

A: Immediately.

Q: Currently, are you maintaining those instructions?

A: Yes.

N.T. 3/12/08 at 147–48. Detective Dykes discussed the fact that, whenever the Chester County Murder Task Force discussed Mr. Jennings' murder, individuals who had been involved with the thirteenth investigating grand jury were required to leave the room. N.T. 3/12/08 at 150. Such individuals included Deputy DA Kelly, Deputy DA Yen, ADA Hobart, and Detective Campbell. N.T. 3/12/08 at 150.

Detective Dykes was involved with Appellant's arrest. N.T. 3/12/08 at 150. In summarizing his investigation, Detective Dykes gave a chronological account of his findings. He testified that, on September 15, 2006, Ms. Beckett informed the police that her son had heard "on the streets" Appellant may have had "something to do with the death of Mr. Jennings." N.T. 3/12/08 at 153. Moreover, on October 13, 2006, Mr. Fields told the police that Appellant told him Mr. Johnson had shot Mr. Jennings in retaliation for him stealing Appellant's gold chain. N.T. 3/12/08 at 155. In February of 2007, Detective Dykes met with Mr. Johnson, who informed the police he was a witness to the homicide of Mr. Jennings but that he

would not give a statement until he had the opportunity to consult with his attorney. N.T. 3/12/08 at 156. During the meeting, Mr. Johnson said to Detective Dykes, "[T]his was all over a stupid chain." N.T. 3/12/08 at 156.

Detective Dykes met with Mr. Johnson later in the month of February of 2007, at which time Mr. Johnson gave a detailed account of what transpired on the night Mr. Jennings was murdered. N.T. 3/12/08 at 157. In particular, Mr. Johnson implicated Appellant as shooting Mr. Jennings, who attempted to flee. N.T. 3/12/08 at 157. Mr. Johnson told the detective his girlfriend, Ataya Shabazz, told him Ms. Beckett told her Appellant admitted he killed Mr. Jennings. N.T. 3/12/08 at 160. Mr. Johnson told Detective Dykes he was coming forward with information about the murder because, when he was incarcerated in the county prison on unrelated charges, a corrections officer told him that he was "being blamed" for killing Mr. Jennings. N.T. 3/12/08 at 160. Mr. Johnson decided to come forward to correct any misinformation, which may have been provided to the police. N.T. 3/12/08 at 161.

In February of 2007, Detective Dykes met with Ms. Shabazz, who confirmed Ms. Beckett had told her Appellant admitted he shot Mr. Jennings. N.T. 3/12/08 at 161. Ms. Shabazz agreed to wear a body wire, and on February 21, 2007 and March 22, 2007, the police recorded conversations she had with Ms. Beckett. N.T. 3/12/08 at 162. On April 7, 2007, Detective Dykes watched a video recording of Mr. Jennings' funeral and he observed as Mr. Peoples placed an item, presumably Appellant's gold chain, in the coffin. N.T. 3/12/08 at 162–63. The police later exhumed Mr. Jennings' coffin and discovered inside Appellant's gold chain.

On April 26, 2007, Ms. Beckett made a statement to the police wherein she admit-

ted Appellant was mad because his chain had been stolen. N.T. 3/12/08 at 167. A few hours after the murder, Appellant told her he "did what [he] had to do," and they drove to Maryland, where she saw Appellant place a plastic bag in a dumpster behind a strip mall. N.T. 3/12/08 at 167–69. In October of 2007, Mr. Allen told the detective that, while he was in prison, Mr. Fields told him Appellant shot Mr. Jennings and he was attempting to place the blame on Mr. Johnson. N.T. 3/12/08 at 172.

After summarizing his investigation, Detective Dykes specifically testified he never discussed the murder of Mr. Jennings with anyone who had information concerning Appellant offering immunized testimony before the thirteenth investigating grand jury. N.T. 3/12/08 at 173.

On cross-examination, Detective Dykes confirmed that, as of early fall 2006, the police had statements from four people, who indicated Mr. Johnson had told them he had killed Mr. Jennings. N.T. 3/12/08 at 177. Detective Dykes testified that, initially, the police sought Appellant's cooperation because they believed Appellant had witnessed Mr. Johnson shooting Mr. Jennings. N.T. 3/12/08 at 177. Thus, with the expectation Appellant had been a witness to the shooting, "steps were put in motion to compel [Appellant] to testify before the grand jury[.]" N.T. 3/12/08 at 178. Detective Dykes confirmed that, prior to October 1, 2006, police had approached Appellant's attorney asking him to encourage Appellant to cooperate as a witness to the shooting, and the "state of belief of the law enforcement community" was that Appellant was a witness but not the suspected shooter. N.T. 3/12/08 at 179.

Prior to the issuance of Appellant's subpoena, Detective Dykes, Detective Quinn, and Deputy DA Kelly knew Appellant was going to be compelled to appear before the grand jury to testify as to what he witnessed on the night of the murder. N.T. 3/12/08 at 179. Detective Dykes testified he served the subpoena upon Appellant for his grand jury appearance in October of 2006; however, he did not serve the subpoena upon Appellant for his November 16, 2006 grand jury appearance. N.T. 3/12/08 at 180. Detective Dykes confirmed he knew Appellant had appeared before the grand jury and then "all of a sudden" he was directed not to speak to certain people regarding the investigation of Mr. Jennings' murder. N.T. 3/12/08 at 180–81. Detective Dykes testified he had no idea why he was not permitted to speak to these people about the murder; however, there were "a lot of thoughts that crossed [his] mind" as to why he could not speak to them any longer. N.T. 3/12/08 at 181. Appellant offering immunized testimony was "one of those thoughts." N.T. 3/12/08 at 181–82. The following relevant exchange then occurred:

Q: Did it become apparent to you that the investigation was changing direction after November of 2006?

A: Yes.

Q: And who changed the direction?

A: At that time we had information that came forward, I believe, to us. And I don't think it was anybody in particular that told us. It was myself and Detective Quinn conducting interviews.

Q: Can you identify a single interview that led you from your belief that Johnson had admitted to at least four people that he had done the shooting between November 16th, 2006 and, let's say, February 1st, 2007?

A: Some of the people we had interviewed probably, I would say, September to November, we had discovered

were not truthful and forthcoming with their information.

\* \* \*

Q: Tell the judge what happened between November 15th and February 1st that caused you to change the direction of your investigation.

**THE COURT:** Let's use years after the dates, because we are covering '06 and '07.

**[APPELLANT'S COUNSEL]:** I apologize, Your Honor. That's a fair request.

Q: Detective, identify for the judge what happened between November 15th, 2006 and February 1st, '07 to change the course and direction of your investigation, other than the fact that [Appellant] had testified with immunity before the grand jury.

A: If I'm not mistaken, the task force, we were conducting multiple homicide investigations. Once we were told not to speak to these individuals, myself and Detective Quinn assumed something had taken place. And we at that point—that investigation sort of laid dormant until these issues could be resolved. That's what we were told.

Q: What's the next thing that happened that caused you to change the direction of your investigation?

A: I believe Mr. Johnson came forward.

Q: When Mr. Johnson came forward, he was the same Mr. Johnson who you believed was the shooter who had already confessed to four different people, right?

A: I didn't believe anything. It was based on information during the course of our investigation that led us in the direction. It wasn't a matter of what I believed.

Q: Here's what I'm troubled by. See if you can help me out. Before November 15th, 2006, you and other investigators believed that Johnson was the killer and he had confessed to at least four different people, correct?

A: Yes, we had obtained information to that effect.

Q: On November 16th, you assumed [Appellant] had testified with immunity before the grand jury. And you were told you were no longer allowed to talk to any of the people who knew what he said.

A: No, I did not know when [Appellant] actually testified before the grand jury until I actually saw in the newspaper from the article which you had published.

Q: Which I had published?

A: Well, which you were quoted by saying what was going on with the prosecution.

Q: You mean in which the motion that we filed was quoted.

A: That's correct[.]

N.T. 3/12/08 at 182–186.

Detective Dykes testified that, at some point, ADA Ost–Prisco asked to be briefed about the murder of Mr. Jennings and they never discussed why he was reassigned to the case. N.T. 3/12/08 at 191–94.

On redirect examination, the following relevant exchange transpired:

Q: Sir, [Appellant's counsel] had asked you about your assumptions and I believe educated suspicions regarding the grand jury. Is that why you arrested [Appellant]?

A: No.

Q: What was the reason?

A: Based on information we had developed during our investigation.

Q: And is that the information that you testified on direct examination as receiving?

A: That's correct.

N.T. 3/12/08 at 200–201.

Coatesville City Police Detective Martin Y. Quinn testified he has been involved in the investigation of Mr. Jennings' murder from the moment it occurred on October 19, 2005; however, he was neither involved in the grand jury investigation nor reviewed any grand jury transcripts. N.T. 3/12/08 at 204–05. He indicated his awareness that the grand jury convened in the latter part of 2006, Appellant was subpoenaed to testify, and at some point, his chief informed him at a task meeting that "a Chinese Wall [had been] erected." N.T. 3/12/08 at 204–07. His chief did not tell him why the "Chinese Wall" had been erected; however, he was ordered not to speak with certain detectives and members of the District Attorney's Office about Mr. Jennings' murder. N.T. 3/12/08 at 208. Detective Quinn never violated his chief's instructions and continued investigating the murder without speaking to the prohibited individuals. N.T. 3/12/08 at 208–09, 227. Detective Quinn's testimony concerning the police's investigation of Mr. Jennings' murder was substantially similar to Detective Dykes' testimony on the matter.

On cross-examination, Detective Quinn admitted that, on August 15, 2006, the police went to Appellant's attorney's office seeking a statement from Appellant. N.T. 3/12/08 at 231. Detective Quinn indicated that, at the time, it appeared Mr. Johnson and Appellant were both present during the shooting and the police wanted to know "a little bit more about" each person's actions. 4/18/08 at 256. On August 8, 2006, Detective Quinn wrote an interoffice email summarizing information about the shooting. N.T. 4/18/08 at 259. The email indicated a witness had made statements relating that Appellant had Mr. Jennings killed. N.T. 4/18/08 at 259. Since Appel-

lant's attorney would not produce Appellant for a statement, the police took actions to compel Appellant to "say what he knew about the case." N.T. 4/18/08 at 259–60. Detective Quinn admitted he knew Appellant had asserted his Fifth Amendment privilege before the grand jury in October of 2006, and Appellant appeared a second time, although he did not know when Appellant appeared the second time. N.T. 4/18/08 at 270–73.

Detective Quinn explained the police were investigating five different homicides at that time and he moved on to other cases after Appellant would not make a statement. N.T. 4/18/08 at 273. At some point, his chief informed him a "Chinese Wall" had been erected and he was told to continue his investigation as if "nothing ever happened." N.T. 4/18/08 at 278. Detective Quinn testified he did not know why the "Chinese Wall" had been erected, although he assumed something unexpected had happened before the grand jury. N.T. 4/18/08 at 293. Detective Quinn specifically denied knowing that Appellant had testified with immunity before the grand jury, and in fact, he first learned Appellant had offered immunized testimony when he read a newspaper article related to Appellant's motion to dismiss. N.T. 4/18/08 at 280.

After he was told a "Chinese Wall" had been erected, Detective Quinn continued investigating the murder with the focus being on Mr. Johnson as the most likely suspect; however, statements made by various people pointed to Appellant as the shooter. N.T. 4/18/08 at 294.

On redirect examination, Detective Quinn testified:

Q: Detective Quinn, there have been a lot of questions concerning what assumptions you may or may not have had with respect to [Appellant]—

A: Yes.

Q: —and this grand jury. Did any of these assumptions affect in any way your decision to charge [Appellant] with this homicide?

A: No, sir.

Q: Did any of those assumptions affect your investigation in any way which led to the evidence to [Appellant's] arrest?

A: No, sir.

N.T. 4/18/08 at 307–08.

District Attorney Joseph Carroll confirmed Appellant received immunity to testify before the grand jury and, following Appellant's testimony, ADA Hobart orally provided DA Carroll with a summary of its content. N.T. 4/18/08 at 317. DA Carroll immediately instructed certain members of the district attorney's office and police not to speak to anyone else regarding the situation and to have no further involvement in the investigation. N.T. 4/18/08 at 320–22. DA Carroll testified the instruction pertained to him, and he has never revealed what he learned about Appellant's immunized grand jury testimony to anyone. N.T. 4/18/08 at 322–23. DA Carroll did not have any involvement in the arrest of Appellant, he took steps to isolate himself from the subsequent murder investigation, and he did not attend any murder task force meetings pertaining to Mr. Jennings' homicide. N.T. 4/18/08 at 323, 353.

On cross-examination, DA Carroll admitted that he authorized the request for Appellant's grand jury immunity order because he did not believe Appellant "was a killer" and he sought whatever information he might have regarding the shooting. N.T. 4/18/08 at 329. DA Carroll indicated he was "satisfied that it was very unlikely [Appellant] was a potential defendant[; however] [he] still did not know whether he would be of any use as a witness[.]" N.T. 4/18/08 at 331. After Appellant gave his immunized grand jury testimony, DA Carroll reassigned Mr. Jennings' homicide

to a new prosecutor in order to protect Appellant's rights. N.T. 4/18/08 at 235. DA Carroll admitted he was not certain what conclusion the investigators would draw from the fact certain people could no longer participate in the investigation; however, he hoped the investigators would just move on thinking there was a "mysterious problem with the grand jury." N.T. 4/18/08 at 347. For those investigators who were not involved in the grand jury, DA Carroll did not tell them Appellant had taken the stand, let alone offered immunized grand jury testimony. N.T. 4/18/08 at 347. "[He] told them [he] couldn't tell them anything about what happened before the grand jury." N.T. 4/18/08 at 347.

Deputy DA Stephen Kelly indicated immunity was sought for Appellant because the investigation tended to reveal Appellant was a witness to the murder. N.T. 4/18/08 at 357. In particular, Deputy DA Kelly pointed to various witnesses who informed the police Mr. Johnson had confessed to the murder, as well as Mr. Fields' statement indicating Appellant had witnessed Mr. Johnson shooting Mr. Jennings. N.T. 4/18/08 at 358–360. Deputy DA Kelly testified he never violated DA Carroll's instructions to remain silent as to Appellant's immunized grand jury testimony, and he removed himself from the murder investigation. N.T. 4/18/08 at 369, 371. He confirmed the case was reassigned to another prosecutor, who had no knowledge of Appellant's immunized grand jury testimony, in an effort to prevent any "taint" to the investigation from Appellant's immunized testimony. N.T. 4/18/08 at 370.

On cross-examination, Deputy DA Kelly admitted that unsuccessful efforts were made to find out what Appellant knew before he was called to testify before the grand jury. N.T. 4/18/08 at 376–77. He further admitted that, as of November 16, 2006, he believed Appellant was "most

likely" a witness to the murder and Mr. Johnson was "likely the killer." N.T. 4/18/08 at 386. After Appellant appeared before the grand jury on November 16, 2006, Deputy DA Kelly said nothing to investigators as to what had transpired, even though the murder investigation was ongoing. N.T. 4/18/08 at 398.

Chester County Detective Lieutenant Joseph Brooks confirmed that, as of October 1, 2006, Appellant and Mr. Johnson were the two main suspects in the killing of Mr. Jennings. N.T. 4/18/08 at 428. Detective Brooks was never told Appellant had asserted his Fifth Amendment privilege before the grand jury or was compelled to appear and testify subject to an immunity order. N.T. 4/18/08 at 429–430. Detective Brooks admitted he knew something must have happened before the grand jury because, at some point, DA Carroll informed him that, although he was to continue the investigation, he was not to speak to certain other members of the task force regarding the investigation of Mr. Jennings' murder. N.T. 4/18/08 at 430. Detective Brooks denied knowing Appellant had been given immunity to testify, and in fact, he first learned about Appellant's immunized grand jury testimony when he read a newspaper article, which was written about Appellant's motion to dismiss. N.T. 4/18/08 at 430–429, 437.

On cross-examination, Detective Brooks testified he was unable to access any of Appellant's grand jury testimony or, in fact, discover whether he presented any testimony. N.T. 4/18/08 at 440. Further, he followed DA Carroll's directive not to speak with certain individuals, even though he was never given a reason for the directive. N.T. 4/18/08 at 441. Additionally, he confirmed the task force did not discuss Mr. Jennings' murder in front of certain

people who were prohibited from the investigation. N.T. 4/18/08 at 442.

On redirect examination, Detective Brooks testified he was not sure why he could not speak to certain people and he assumed it had to do with the "nuances of a grand jury." N.T. 4/18/08 at 443. He did not suspect it had to do with Appellant offering immunized testimony. N.T. 4/18/08 at 443.

Detective Kevin Campbell testified he was involved in the thirteenth investigating grand jury and, as of November 16, 2006, he was aware of the contents of Appellant's immunized testimony. N.T. 4/25/08 at 477. Approximately one hour after Appellant testified, DA Carroll ordered Detective Campbell not to discuss the testimony with anyone, and Detective Campbell abided by the instructions. N.T. 4/25/08 at 477. He never revealed the contents of Appellant's testimony to anyone and remained silent as to his knowledge that Appellant had given immunized testimony. N.T. 4/25/08 at 477–79.

On cross-examination, Detective Campbell acknowledged that, prior to November 16, 2006, he participated in task force discussions regarding the murder of Mr. Jennings; however, after that date, he did not. N.T. 4/25/08 at 481, 494. Prior to November 16, 2006, Mr. Johnson was the principal suspect in the shooting and the police viewed Appellant as a witness. N.T. 4/25/08 at 481. After Appellant's first grand jury appearance, in October of 2006, Detective Campbell informed the task force Appellant had invoked his Fifth Amendment privilege. N.T. 4/25/08 at 485. The task force did not discuss whether the district attorney's office should seek immunity for Appellant since that is a question for the lawyers and "[i]t's not something that detectives favor." N.T. 4/25/08 at 486. However, there was discussion about the fact that Appellant should be served with

another subpoena and be compelled to testify. N.T. 4/25/08 at 487.

After Appellant's grand jury appearance on November 16, 2006, whenever the task force began discussing Mr. Jennings' murder, Detective Campbell left the room, as did a few of the attorneys. N.T. 4/25/08 at 492. The other task force members were told DA Carroll had given an order that they were to leave the room because they could no longer be involved in the meetings regarding Mr. Jennings' homicide. N.T. 4/25/08 at 492, 494.

Chester County Chief of Detectives Albert L. DiGiacamo confirmed Mr. Jennings' murder was a subject of the task force. N.T. 4/18/08 at 444–46. The relevant exchange occurred on direct examination by Appellant's counsel:

Q: Did you anticipate that you would learn about the grand jury testimony of [Appellant]?

A: I anticipated that we would at some point, we would learn of testimony, if it was relevant to the homicide.

Q: Because that's why you call people in front of the grand jury in a task force investigation is to find out what information they have, right?

A: Yes, sir.

Q: And what information did you learn regarding the appearance of [Appellant]?

A: Just absolutely nothing.

Q: And did that surprise you?

A: Yes.

Q: And did you inquire why?

A: No, I didn't inquire why.

Q: Did you have a belief or an understanding as to why?

A: There were several beliefs, because there were several possibilities.

Q: Did you have a belief or expectation that [Appellant] had given testimony under immunity that you couldn't use because it was contrary to his interests?

A: That was one possibility, but there are others.

\* \* \*

Q: Did there come a time in the meetings of the task force where [Appellant] went from being a witness to being a target?

A: My recollection is he was always a potential target.

\* \* \*

Q: Sir, when these people would have to get up and leave the investigation, leave the task force meetings, why did you think that was? Why did you think they were having [sic] to leave?

A: What people are you talking about, sir?

Q: Steve Kelly, Pete Hobart, Ron Yen, Joe Carroll, Kevin Campbell, why did they have to get up and leave?

A: They were instructed to. They were instructed to. We could not discuss matters regarding the Jennings homicide with them. And quite frankly, I excused anybody from the room at the end of the—when we were beginning to discuss the Jennings homicide, if any of those individuals were in the room. I excused them from the room.

Q: Why did you think that was required?

A: Because both myself and members of our task force were informed that we could not speak to these individuals, nor could they speak to us about any matters regarding the grand jury appearance.

Q: Why was that restriction in place? What did you think that restriction was imposed for?

A: It was an order.

Q: Why was it ordered?

A: I don't question why. The District Attorney gave the order and I followed the order.

Q: Did you believe it had to do with the fact that [Appellant] had given immunized testimony before the grand jury?

A: It was one of the beliefs. That could have occurred, sure.

N.T. 4/18/08 at 455, 458, 461–62.

On cross-examination, Chief DiGiacamo testified that he has never read any of the grand jury testimony concerning Mr. Jennings' homicide, he has never learned the substance of any grand jury testimony, and he abided by the instructions not to speak to certain people after Appellant appeared before the grand jury. N.T. 4/18/08 at 463–64. He further testified that he was not certain Appellant had been granted immunity until after the court's hearing in March of 2008. N.T. 4/18/08 at 465–66.

Peter Kratsa, Esquire, testified Mr. Fields retained him on December 13, 2007, to represent his interests because he had been subpoenaed to appear before the grand jury on December 14, 2007. N.T. 4/25/08 at 505. On December 14, 2007, Attorney Kratsa engaged in a discussion with ADA Ost–Prisco seeking a compromise so that Mr. Fields would not have to appear before the grand jury. N.T. 4/25/08 at 507. On January 24, 2007, an impromptu meeting occurred in a common area of the courthouse where ADA Ost–Prisco informed Attorney Kratsa his suggested compromise "was not going to work." N.T. 4/25/08 at 508. During the impromptu meeting, Deputy ADA Kelly, who appeared to be in the area by happenstance, joined the meeting and disputed with Attorney Kratsa the validity of his reasons for seeking to quash the subpoena against Mr. Fields. N.T. 4/25/08 at 509. Ultimately, Mr. Fields' motion to quash was denied and he was held in contempt of the grand jury. N.T. 4/25/08 at 512. ADA Ost–Prisco handled the contempt proceedings; Deputy ADA Kelly was not present. N.T. 4/25/08 at 513.

On cross-examination, Attorney Kratsa did not recall Deputy ADA Kelly discussing at the impromptu meeting what Mr. Fields' grand jury testimony was likely to be, and he admitted the brief meeting concerned the validity of the motion to quash Mr. Fields' grand jury subpoena. N.T. 4/25/08 at 514–15. He agreed that it was "fair to say" Deputy ADA Kelly's conversation at the impromptu meeting concerned only the procedural aspects of the motion to quash. N.T. 4/25/08 at 515.

Detective Sergeant James C. Vito testified he took notes during the task force meetings, and he offered testimony regarding his notes. Specifically, his notes revealed the task force first discussed Mr. Jennings' homicide on May 22, 2006, at which time Germaine Myers was a suspect. N.T. 4/25/08 at 517. On May 24, 2006, the task force received a tip that Mr. Johnson killed Mr. Jennings. N.T. 4/25/08 at 518. Thus, both Myers and Johnson were suspects. N.T. 4/25/08 at 518. On August 10, 2006, the task force was focusing on Mr. Johnson as a suspect; however, they concluded it was important to speak to Appellant. N.T. 4/25/08 at 521. Detective Vito made a note from the August 10, 2006 task force meeting suggesting "[Appellant] is supposed to have contracted Johnson to kill Jennings ... Story is [Appellant] had a chain stolen from [the victim]. Johnson and [Appellant] confront [the victim]. [The victim beat [Appellant], and Johnson then shoots [the victim]." N.T. 4/25/08 at 548. Since Appellant would not speak to the police, the task force recommended the district attorney's office compel Appellant to appear before the grand jury to disclose what he knew about the shooting. N.T. 4/25/08 at 523.

As of September 7, 2006, the task force questioned whether Appellant was a suspect or a witness in Mr. Jennings' homicide. N.T. 4/25/08 at 525. As of October 19, 2006, the task force knew Appellant was going to be subpoenaed to appear before the grand jury as a potential witness. N.T. 4/25/08 at 527. Detective Vito testified he did not know Appellant had asserted his Fifth Amendment privilege before the grand jury or that he was compelled to appear a second time under the grant of immunity. N.T. 4/25/08 at 529, 533.

In late 2006, ADA Carroll dismissed Detective Campbell from the investigation, and he told the task force that something had happened between Appellant and the grand jury, thus requiring the erection of a "Chinese Wall." N.T. 4/25/08 at 531. Thereafter, certain people were no longer permitted to participate in the investigation of Mr. Jennings' murder and they were required to leave the task force meetings while the investigation was being discussed. N.T. 4/25/08 at 531. Detective Vito speculated as to the reasons for the instruction; however, he did not believe the problem was that Appellant had offered immunized testimony implicating himself. N.T. 4/25/08 at 539–40. The following relevant exchange occurred:

Q: Is it fair for us to conclude, for the judge to conclude, that before the problem occurred with the grand jury that Mr. Carroll told you about, that the relationship between Johnson and [Appellant] had been target and witness?

A: Meaning [Appellant] as a witness?

Q: Johnson was a target and [Appellant] was witness, right.

A: I think that's right, yes.

Q: And after the problem with the grand jury, [Appellant] became a subject of your investigation and everything pivoted; would that be fair to conclude?

A: No, I wouldn't say that at all.

N.T. 4/25/08 at 541.

As of January 9, 2007, the task force knew Mr. Johnson had been charged in an unrelated case and, in his notes from the January 9, 2007 task force meeting, Detective Vito indicated "[Appellant] is a witness or co-conspirator." N.T. 4/24/08 at 545. His notes further revealed that, on February 8, 2007, ADA Ost–Prisco indicated at the task force meeting that, a few days prior, Ms. Shabazz informed him Mr. Johnson wanted to "talk about something we would be interested in." N.T. 4/24/08 at 554. Thereafter, Mr. Johnson informed the police Appellant had committed the murder.

On cross-examination, Detective Vito confirmed his notes from the August 10, 2006 task force meeting revealed Appellant was a potential suspect in the shooting and the investigation into the shooting was ongoing. N.T. 4/24/08 at 563. He also confirmed he read no transcripts from the thirteen investigating grand jury and he never violated DA Carroll's instruction not to speak to certain people about the investigation. N.T. 4/24/08 at 566–67.

The following relevant exchange occurred on redirect examination:

Q: The second piece of the grand jury is when [DA] Carroll told you that he had appeared and there had been a problem and now there had to be a Chinese Wall, right?

A: That's right.

Q: Once that happened, did you suspect that [Appellant] had testified about something that you weren't allowed to know about?

A: That was, that seemed to me to be the most accurate thing we could assume.

Q: There didn't seem to be much doubt about that part of it, right?

A: As incredible as it was, yes.

Q: At that point did your level of suspicion increase regarding what [Appellant] had said and actually done?

A: I don't know if I broke it down in that way.

Q: Well, the next thing that happened in your notes regarding [Appellant] is that he's described as a co-conspirator, right?

A: Well, I have to mention that that is a reflection of mine in my notes.

Q: Yes.

A: So that I have some perspective on the role [Appellant] played in the investigation. To me, it's a reflection of my uncertainty of whatever he is, what role he played. And as to what he testified to, I still don't know.

N.T. 4/24/08 at 572–73.

First Assistant District Attorney Patrick Carmody confirmed that, in early 2007, he began supervising ADA Ost–Prisco with regard to Mr. Jennings' murder, he was aware there were certain people with whom he was not permitted to speak about the case, and he abided by the restriction. N.T. 4/28/08 at 593–96. First ADA Carmody did not know Appellant had been called to testify before the grand jury. N.T. 4/28/08 at 595. In February of 2007, ADA Ost–Prisco approached First ADA Carmody regarding a plea bargain for Mr. Johnson in unrelated cases, and First ADA Carmody told him not to offer a plea bargain until they determined Mr. Johnson's role, or what information he might have, in connection with Mr. Jennings' murder. N.T. 4/28/08 at 598–600.

ADA Ost–Prisco was recalled to the stand and he admitted he eventually came to the conclusion that he had been reassigned the case "because someone ha[d] given immunized derivative use protected testimony[.]" N.T. 4/28/08 at 608. When he was assigned to the case, there was question among the law enforcement community as to whether Appellant was a suspect or witness in Mr. Jennings' homicide. N.T. 4/28/08 at 613–14.

At the conclusion of all testimony, by Opinion and Order filed on December 5, 2008, the trial court denied Appellant's motion to dismiss.

On May 19, 2009, the Commonwealth filed a motion *in limine* seeking to prohibit Appellant from questioning Mr. Johnson at trial regarding the specific facts underlying two cases in which Mr. Johnson had entered guilty pleas, as well as a forgery case which was then pending against him. Appellant filed a motion and supplemental motion in opposition, and by order filed on June 5, 2009, the trial court granted the Commonwealth's motion *in limine*.

Appellant proceeded to a jury trial, at the conclusion of which the jury convicted him of the offenses indicated *supra* in connection with the homicide of Mr. Jennings, and on June 16, 2009, Appellant was sentenced to life in prison. This timely appeal followed. The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the trial court filed a responsive Pa.R.A.P. 1925(a) opinion on September 2, 2009.

Appellant's first contention is that, pursuant to *Kastigar*, the trial court erred in denying his pre-trial motion to dismiss the prosecution on the basis the Commonwealth did not "use or derivatively use" Appellant's immunized grand jury testimony. Appellant asserts the Commonwealth did not prove its prosecution of Appellant was based on a legitimate source wholly independent of Appellant giving compelled, immunized grand jury testimony. That is, Appellant argues the police impermissibly used his immunized testimony as an inves-

tigatory lead and improperly targeted him as the suspected shooter after he offered his immunized grand jury testimony.

■ Initially, we note that the decision to grant or deny a motion to dismiss criminal charges is vested in the sound discretion of the trial court and may be overturned only upon a showing of abuse of discretion or error of law. *Commonwealth v. Doolin*, 24 A.3d 998 (Pa.Super.2011).

In *Kastigar*, the U.S. Supreme Court granted *certiorari* to resolve the important question of whether testimony may be compelled by granting immunity from the use of compelled testimony and evidence derived therefrom ("use and derivative use" immunity), or whether it is constitutionally necessary to grant immunity from prosecution for offenses to which compelled testimony relates ("transactional" immunity). In resolving the issue, the U.S. Supreme Court stated, in relevant part, the following:

> The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo–American jurisprudence.... The power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor.... But the power to compel testimony is not absolute. There are a number of exemptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination.... Immunity statutes, which have historical roots deep in Anglo–American jurisprudence, are not incompatible with these values.... The existence of these statutes reflects the importance of testimony, and the fact that many offenses are of such character that the only persons capable of giving useful testimony are those implicated in the crime.

> \* \* \*

> [With regard to the grant of immunity,] the use of compelled testimony and evidence derived therefrom is coextensive with the scope of the [Fifth Amendment] privilege. [A] statute's explicit proscription of the use in any criminal case of 'testimony or other information compelled under the order (or any such information directly or indirectly derived from such testimony or other information)' is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore, is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted.... Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

> \* \* \*

> [I]mmunity from use and derivative use 'leaves the witness and the ... Gov-

ernment in substantially the same position as if the witness had claimed his privilege in the absence of a grant of immunity.'

*Kastigar,* 406 U.S. at 443–459, 92 S.Ct. 1653 (footnotes omitted).

Additionally, in explaining the nature of immunity from "use and derivative use" the U.S. Supreme Court addressed the following concerns:

Petitioners argue the use and derivative-use immunity will not adequately protect a witness from various possible incriminating uses of the compelled testimony: for example, the prosecutor or other law enforcement officials may obtain leads, names of witnesses, or other information not otherwise available that might result in a prosecution. It will be difficult and perhaps impossible, the argument goes, to identify, by testimony or cross-examination, the subtle ways in which the compelled testimony may disadvantage a witness[.]

This argument presupposes that [a] statute's prohibition will prove impossible to enforce.

\* \* \*

[A statute which provides a] total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead' and also barring the use of any evidence obtained by focusing investiga-

tion on a witness as a result of his compelled disclosures.

\* \* \*

[In fact,] [o]nce a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.

This burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

This is very substantial protection, commensurate with that resulting from invoking the [Fifth Amendment] privilege itself.... [A immunity statute,] like the Fifth Amendment, [need not] grant ... pardon nor amnesty. [The immunity statute] and the Fifth Amendment [must] allow government to prosecute using evidence from legitimate independent sources.

*Kastigar,* 406 U.S. at 459–461, 92 S.Ct. 1653 (footnotes and citation omitted).

Subsequent to *Kastigar,* the Pennsylvania Supreme Court, in *Commonwealth v. Swinehart,* 541 Pa. 500, 664 A.2d 957 (1995), considered whether Pennsylvania's "use and derivative use" immunity statute, as codified at 42 Pa.C.S.A. § 5947,[1] is con-

---

1. 42 Pa.C.S.A. § 5947 provides, in relevant part:

§ 5947. **Immunity of witness**
  (a) **General rule**—Immunity orders shall be available under this section in all proceedings before:
    (1) Courts.
    (2) Grand juries.
    (3) Investigating grand juries.

  (4) The minor judiciary or coroners.
    \* \* \*
  (c) **Order to testify.**—Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding specified in subsection (a), and the person presiding at such proceeding communicates to the witness an immunity order, that witness may not refuse to testify based on his privilege against self-incrimination.

sistent with the Pennsylvania constitutional privilege at Article 1, Section 9, against compelled self-incrimination. In finding that the statute is constitutional, and explaining the application of the statute, the Pennsylvania Supreme Court stated, in relevant part, the following:

> The very nature of criminal conspiracies is what forces the Commonwealth into the Hobson's choice of having to grant one of the parties implicated in the criminal scheme immunity in order to uncover the entire criminal enterprise. Thus, in order to serve justice an accommodation must be made, however, that arrangement should not place the 'witness' in a better position as to possible criminal prosecution that he had previously enjoyed. A grant of immunity should protect the witness from prosecution through his own words, yet it should not be so broad that the witness is forever free from suffering the just consequences of his actions, if his actions can be proven by means other than his own words.

> ∗ ∗ ∗

> Recognizing the serious practical concerns which almost always accompany a later prosecution of the immunized witness, we hold that in the later prosecution, the evidence offered by the Commonwealth shall be reviewed with the most careful scrutiny. That is, the Commonwealth must prove, of record, by the heightened standard of clear and convincing evidence,[2] that the evidence upon which a subsequent prosecution is brought arose *wholly* from independent sources.

*Swinehart,* 541 Pa. at 523–26, 664 A.2d at 968–69 (emphasis in original) (footnote added).

⬛ In the case *sub judice,* we agree with the trial court that the Commonwealth proved, by clear and convincing evidence, the prosecution of Appellant arose wholly from independent sources. That is, the Commonwealth proved during the hearing on Appellant's motion to dismiss that the evidence it proposed to use was derived from a legitimate source wholly independent of Appellant's compelled, immunized grand jury testimony. For instance, the record reveals that, prior to Appellant offering his immunized grand jury testimony on November 16, 2006, the investigating task force had information Appellant was criminally involved in the homicide. Specifically, Detective Quinn testified that, in August of 2006, a witness told the police Appellant had Mr. Jennings' killed, and Detective Vito made a notation from the task force meeting acknowledging Appellant may have contracted Mr. Johnson to kill Mr. Jennings in retaliation for the theft of a gold chain. On September 15, 2006, Ms. Beckett told the police

---

**(d) Limitation on use.**—No testimony or other information compelled under an immunity order, or any information directly or indirectly derived from such testimony or other information, may be used against a witness in any criminal case, except that such information may be used:

  (1) in a prosecution under 18 Pa.C.S. § 4902 (relating to perjury) or under 18 Pa.C.S. § 4903 (relating to false swearing);

  (2) in a contempt proceeding for failure to comply with an immunity order; or

  (3) as evidence, where otherwise admissible, in any proceeding where the witness is not a criminal defendant.

42 Pa.C.S.A. § 5947(a), (c), and (d) (bold in original).

2. "The clear and convincing standard requires evidence that is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in] issue." *Commonwealth v. Morgan,* 16 A.3d 1165, 1168 (Pa.Super.2011) (quotation and quotation marks omitted).

her son had "heard on the streets" that Appellant "may have had something to do with the death of Mr. Jennings." N.T. 3/12/08 at 153. However, the police also had information from four individuals that Mr. Johnson was bragging about having committed the crime, and in October of 2006, Mr. Fields told the police Appellant had told him that Mr. Johnson shot Mr. Jennings in his presence. Thus, although the Commonwealth suspected Appellant was somehow involved in the murder of Mr. Jennings, they believed, largely based on Mr. Fields' statement, that Appellant was a witness and Mr. Johnson was the shooter. Therefore, the Commonwealth compelled Appellant's testimony before the investigating grand jury.

Subsequent to Appellant appearing before the grand jury, in what the police characterized as an ongoing murder investigation, on approximately February 8, 2007, Ms. Shabazz telephoned the police indicating Mr. Johnson wanted to provide them with information. Therefore, in February of 2007, Detective Dykes met with Mr. Johnson, who indicated he would not make a full statement without consulting with his attorney; however, he stated the death of Mr. Jennings was "all over a stupid chain." N.T. 3/12/08 at 156. Detective Dykes met with Mr. Johnson later that month, and Mr. Johnson, for the first time, provided a full, detailed account of what transpired on the night Mr. Jennings was murdered. Specifically, he recounted that Appellant shot Mr. Jennings, who attempted to flee. Mr. Johnson told the police he was coming forward because, while he was in prison on unrelated charges, a corrections officer told him that he was being blamed for the shooting.

Mr. Johnson's detailed February, 2007 statement led to Ms. Shabazz wearing a body wire, and in February and March of 2007, the police recorded conversations she had with Ms. Beckett. In April of 2007, the police confronted Ms. Beckett with statements she had made to Ms. Shabazz, and Ms. Beckett then made a full statement indicating that, a few hours after the murder, Appellant told her he "did what [he] had to do," N.T. 3/12/08 at 167, and she recounted how she and Appellant drove to Maryland, which ultimately led to Appellant dumping items in a plastic bag into a dumpster behind a strip mall.

On April 7, 2007, Detective Dykes watched a video of Mr. Jennings' funeral and he observed as Mr. Peoples placed Appellant's gold chain in the coffin. Mr. Jennings' coffin was exhumed so that the gold chain could be removed.

In October of 2007, Mr. Allen told the detective that, while he was in prison, Mr. Fields told him Appellant shot Mr. Jennings and he was attempting to place the blame on Mr. Johnson. Following Mr. Allen making his statement, Mr. Buchanan told the police that, after the homicide, Mr. Fields told him Appellant had killed Mr. Jennings. Thus, based on this investigation, the police concluded Appellant, and not Mr. Johnson, was the person who had shot Mr. Jennings, and therefore, the police charged Appellant with the murder in November of 2007.

Based on the aforementioned, we conclude the trial court did not err in finding the Commonwealth met its burden of proving, by clear and convincing evidence, that the evidence upon which Appellant's subsequent prosecution was brought arose wholly from legitimate, independent sources. *See Kastigar, supra; Swinehart, supra.*

■ We note Appellant suggests that, once he offered immunized grand jury testimony, he could not later be prosecuted for Mr. Jennings' murder because prosecutors and officers knew, or assumed, he had implicated himself under the grant of im-

munity. First, we find the Commonwealth took successful cautionary measures to insulate those members of the district attorney's office and law enforcement officers who were aware of Appellant's immunized grand jury testimony from those who were not so aware. That is, there is no question DA Carroll, Deputy DA Kelly, Deputy DA Yen, ADA Hobart, and Detective Campbell never revealed to other prosecutors or law enforcement officers what had transpired before the grand jury on November 16, 2006. Additionally, out of an abundance of caution, these people were removed from and did not participate in the subsequent investigation of Mr. Jennings' murder. Law enforcement officers, who continued with the ongoing investigation, and the newly appointed prosecutor, were not informed of what had transpired before the grand jury and, in fact, no reason was offered as to why communication with certain individuals about Mr. Jennings murder was being prohibited.

In any event, to the extent Appellant correctly argues prosecutors and officers logically assumed Appellant had made inculpatory statements to the grand jury under the grant of immunity, this does not lead to the conclusion that the Commonwealth improperly used Appellant's com-

pelled testimony as an "investigatory lead" or used any evidence obtained by focusing the investigation on Appellant as a result of his compelled disclosures. *See Kastigar, supra.* It is not conclusive that prosecutors and law enforcement officers assumed, or even knew, Appellant had offered inculpatory immunized grand jury testimony. The issue is what they did with their knowledge or assumptions, *i.e.,* did they violate *Kastigar's* prohibition from "using the compelled testimony in any respect." *Id.* at 459, 92 S.Ct. 1653. Appellant's suggestion that, once he offered immunized grand jury testimony he could not later be prosecuted for the crime because prosecutors and officers assumed he had implicated himself under the grant of immunity is tantamount to an argument for transactional immunity, which the United States and Pennsylvania Supreme Court have already rejected.[3] *Kastigar, supra; Swinehart, supra.*

Simply put, as indicated *supra,* the Commonwealth proved the prosecutors and law enforcement officers did not use Appellant's immunized grand jury testimony as an investigatory lead or focus the investigation on him as a result of his compelled disclosures. An examination of the investigation as it developed reveals

---

**3.** In fact, we note that, in *United States v. Pantone,* 634 F.2d 716 (3rd Cir.1980), the same prosecutor who was present when Pantone gave compelled grand jury testimony subsequently prosecuted Pantone in a related matter. While Pantone admitted the government did not make any direct use of the grand jury testimony, he contended the prosecutor's mere exposure to the compelled testimony rendered it virtually impossible for the government to show it did not indirectly use the testimony, and he argued a new prosecutor should have been appointed. The Third Circuit held: "We do not believe that mere access to immunized grand jury testimony prevents the government from carrying its burden under *Kastigar.*" *Pantone,* 634 F.2d at 720 (citation omitted). Noting *Kastigar*

prohibits the misuse of information gained under a grant of immunity, and does not require the government to disregard information not obtained in this fashion, the Third Circuit found no constitutional violation. Specifically, it held "the spirit of *Kastigar* counsels against an absolute ban against participation by a prosecutor at the trial stage whenever there has been participation by such prosecutor at the grand jury stage." *Pantone,* 634 F.2d at 720. The case *sub judice* presents an even stronger argument that Appellant's immunized grand jury testimony was not derivatively used, and the Commonwealth met its burden under *Kastigar* and *Swinehart,* in that the so-called "Chinese Wall" was erected with a new prosecutor being appointed.

the Commonwealth met its burden of proving, by clear and convincing evidence, that the evidence upon which Appellant's subsequent prosecution was brought arose wholly from legitimate, independent sources, and thus, the trial court did not abuse its discretion in denying Appellant's motion to dismiss the prosecution. *Kastigar, supra; Swinehart, supra; Doolin, supra.*

Appellant's next contention is that, during his jury trial, the trial court erred in permitting defense witness Ms. Shabazz to testify as to Commonwealth witness Ms. Beckett's prior consistent statements in violation of Pennsylvania Rule of Evidence 613(c). Specifically, Appellant challenges the following portions of Ms. Shabazz's cross-examination and re-cross examination by ADA Ost–Prisco, to which Appellant properly objected during trial:

Q: Prior to wearing a wire, did you have conversations with Ms. Beckett where she told you what happened on the night of the murder?

A: Yes.

Q: Did she tell you that she was home when she heard the gunshots?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: State your grounds.

[DEFENSE COUNSEL]: Hearsay, confrontation clause, outside the scope of direct examination, 403–B.

MR. OST–PRISCO: Prior consistent statement of Ms. Beckett.

THE COURT: Overruled.

\* \* \*

A: Yes.

\* \* \*

Q: Did [Ms. Beckett] tell you that when [Appellant] came home, he said to her that he did what he had to do?

[DEFENSE COUNSEL]: Objection, same grounds.

THE COURT: Overruled.

THE WITNESS: Yes.

\* \* \*

Q: Did she tell you what [Appellant] did with the gun that he used to kill Corey Jennings?

A: Yes.

[DEFENSE COUNSEL]: Objection, same grounds.

THE COURT: Overruled.

\* \* \*

Q: Is it fair to say that you told investigators that [Appellant] told Ms. Beckett, "I killed Corey. I killed Corey. And she asked him why did he do it? And he said he felt like he had been robbed. He felt like Corey took his manhood." That's what Beckett told you that [Appellant] told her, correct?

[DEFENSE COUNSEL]: Objection, move for a mistrial.

THE COURT: Overruled.

THE WITNESS: Yes.

N.T. 6/12/09 at 730–31, 741–42.

Appellant contends the trial court erred in permitting Ms. Shabazz's testimony since (1) although Ms. Beckett testified at Appellant's trial, she did not testify as to the prior consistent statements on direct examination, resulting in her being "unavailable for cross-examination," (2) Ms. Beckett's statements could not be admitted through Ms. Shabazz since Ms. Beckett, the declarant, was not offered for cross-examination on the particular statements, and (3) the Commonwealth failed to establish when Ms. Beckett made her prior consistent statements to Ms. Shabazz.

Our standard of review for considering whether a ruling on the admissibility of evidence was proper is well settled:

Admission of evidence is a matter within the sound discretion of the trial court,

and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

*Commonwealth v. Cain,* 29 A.3d 3, 6 (Pa.Super.2011) (quotation omitted).

Pa.R.E. 613 provides, in relevant part, the following:

**Rule 613. Prior statements of witnesses**

\*     \*     \*

**(c) Evidence of prior consistent statement of witness.** Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes if the opposing party is given an opportunity to cross-examine the witness about the statement, and the statement is offered to rebut an express or implied charge of:

(1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or

(2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation.

Pa.R.E. 613(c) (bold in original).

The comment to this rule relevantly provides that "under Pa.R.E. 613(c), a prior consistent statement is always received for rehabilitation purposes only and not as substantive evidence." *See Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284, 301 (1998) (stating: "As a general rule, a prior consistent

statement is hearsay, and its admissibility is dependent upon an allegation of corrupt motive or recent fabrication. Additionally, such statements have been admitted in response to an allegation of faulty memory.")

*Commonwealth v. Baumhammers,* 599 Pa. 1, 51, 960 A.2d 59, 89–90 (2008).

"A prior consistent statement is admissible only if it is made before the declarant has a motive to fabricate." *Commonwealth v. Smith,* 17 A.3d 873, 891 (Pa.2011) (citations omitted).

When considering the admissibility of prior statements, the importance of timing has often been emphasized. *See, e.g., Commonwealth v. Hutchinson,* 521 Pa. 482, 556 A.2d 370 (1989) (requiring that, to be admissible, a prior statement must have been made before any corrupt motive has arisen). *See also* Pa.R.E. 613(c) comment ("When the witness admits and explains the inconsistent statement, the use of the consistent statement will depend upon the nature of the explanation and all of the circumstances that prompted the making of the consistent statement; the timing of that statement, although not conclusive, is one of the factors to be considered.").

*Commonwealth v. Montalvo,* 604 Pa. 386, 407, 986 A.2d 84, 96 (2009).

■ With regard to Appellant's contention Ms. Beckett was unavailable for cross-examination since she did not testify about her prior consistent statements on direct examination, and the Commonwealth improperly introduced her statements through Ms. Shabazz, the trial court stated, in relevant part, the following in its Pa.R.A.P. 1925(a) Opinion:

During cross-examination, the Commonwealth questioned Ms. Shabazz about the statements Ms. Beckett had made to Ms. Shabazz both before and

during the time when Ms. Shabazz wore a wire intercept to record the conversations she had with Ms. Beckett. The evident purpose of the Commonwealth's examination was to rehabilitate Ms. Beckett's credibility by demonstrating that Ms. Beckett's trial testimony was consonant with the statements she had previously made to her friend, Ms. Shabazz. Ms. Beckett's credibility at trial had been previously attacked by defense counsel's questioning on cross-examination of Ms. Beckett regarding statements Ms. Beckett made to Ms. Shabazz in which Ms. Beckett allegedly admitted she had been untruthful in her testimony before the Grand Jury. (*See* Trial Transcript, 6/10/09, 571–97). [Appellant] objected to the Commonwealth's introduction of Ms. Beckett's prior consistent statements through cross-examination of Ms. Shabazz[.] Appellant never requested the opportunity to recall Ms. Beckett on cross[.]

[Appellant] claims that Ms. Beckett's prior consistent statements cannot be admitted through Ms. Shabazz. However, the Pennsylvania Supreme Court allows prior consistent statements to be proved by the person to whom they were made in order to support the credibility of the witness. *Commonwealth v. Hutchinson*, 521 Pa. 482, 556 A.2d 370, 372 (1989) (quotation omitted). *See Commonwealth v. Gore*, 262 Pa.Super. 540, 396 A.2d 1302 (1978) (prior consistent statement of victim to police officer admitted through officer's testimony after the victim testified)[.]

\*  \*  \*

Not only did [Appellant] have the opportunity to cross-examine Ms. Beckett about her prior recorded statements and exercise that opportunity, but he attempted to discredit Ms. Beckett's integrity at trial by portraying her as a defi-

ant liar. . . . [H]e also tried to impugn her credibility by suggesting that she had an improper motive or bias to testify at trial in a manner favorable to the Commonwealth, namely, to avoid prosecution for perjury and the possible life sentence and negative ramifications that such a conversation would cost her for the rest of her life.

\*  \*  \*

[T]here is no merit to [Appellant's] argument that the prior consistent statements of Ms. Beckett were not admissible through Ms. Shabazz because this Court did not permit [Appellant] to cross-examine Ms. Beckett *after* Ms. Shabazz testified. [Appellant] never requested of this Court an opportunity to recall Ms. Beckett as on cross, nor did he ask for a cautionary instruction to the jury[.]

Trial Court Opinion filed 9/2/09 at 9–21 (emphasis in original). We find no abuse of discretion in this regard. *See Cain, supra.*

With regard to Appellant's contention the Commonwealth failed to establish when Ms. Beckett made her prior consistent statements to Ms. Shabazz, we disagree.

■ As indicated *supra*, a prior consistent statement is admissible only if it is made before the declarant has a motive to fabricate. *Smith, supra.* Here, the record reveals Ms. Beckett made her statements to Ms. Shabazz shortly after Mr. Jennings' murder, between October 20, 2005, and December 28, 2005. For instance, on direct examination of Ms. Beckett, the following transpired:

Q: Ms. Beckett, why didn't you tell the grand jury about [Appellant's] statements to you on the night of the murder?

A: Because I didn't want to get involved in this.

Q: Ms. Beckett, between October 20th of 2005 and December 28th of 2005, did you speak to anyone else about the conversations you had with [Appellant] about the homicide?

A: Yes.

Q: Who?

A: Ataya Shabazz.

N.T. 6/10/09 at 565.

Based on Ms. Beckett's testimony that she discussed Appellant's statements regarding the murder between October 20, 2005, and December 28, 2005, which was at a time before Ms. Beckett had a motive to fabricate, we conclude the Commonwealth established the timing of Ms. Beckett's prior consistent statements to Ms. Shabazz. *See Montalvo, supra.* Thus, we conclude the trial court did not err in permitting evidence of Ms. Beckett's prior consistent statements pursuant to Pa.R.E. 613(c).

Appellant's final contention is that, during his jury trial, the trial court violated his constitutional rights in limiting Appellant's cross-examination of Mr. Johnson. Specifically, he alleges the trial court impermissibly limited his cross-examination of Mr. Johnson regarding (1) the specific facts underlying Mr. Johnson's unrelated, pending forgery case since such showed his propensity to lie, and (2) the fact Mr. Johnson received the benefit of a plea agreement in an unrelated case, despite the fact he failed to pass a polygraph examination with regard to the instant case.

"The determination of the scope and limits of cross-examination are within the discretion of the trial court, and we cannot reverse those findings absent a clear abuse of discretion or an error of law." *Commonwealth v. Brown,* 449

Pa.Super. 346, 673 A.2d 975, 978 (1996) (citing *Commonwealth v. Nolen,* 535 Pa. 77, 82, 634 A.2d 192, 195 (1993)), *appeal denied,* 545 Pa. 675, 682 A.2d 306 (1996). [A]n abuse of discretion is not a mere error in judgment, but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law.

*Commonwealth v. Davis,* 17 A.3d 390, 395 (Pa.Super.2011) (quotation and quotation marks omitted).

Under the Sixth Amendment to the United States Constitution, an accused has the right "to be confronted with the witnesses against him." "The main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination." Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (emphasis in original) (quoting 5 J. Wigmore, Evidences 1395, p. 123 (3d ed.1940)).

*Commonwealth v. Paddy,* 15 A.3d 431, 447–48 (Pa.2011) (emphasis in original).

We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionality protected right of cross-examination. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, and prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. [As the United States Supreme Court has observed,] the Confrontation Clause guarantees an *oppor-*

*tunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

A witness may be questioned about pending criminal charges because the witness may be tempted to convict the defendant in order to obtain leniency on the charges that he currently faces.

*Commonwealth v. Bozyk,* 987 A.2d 753, 756–57 (Pa.Super.2009) (quotation, quotation marks, and citation omitted) (emphasis in original).

In the case *sub judice,* Mr. Johnson testified on direct examination about his prior criminal history and unrelated pending charges, including the forgery case. N.T. 6/9/09 at 328–334. Specifically, with regard to Mr. Johnson's then pending forgery charges, the relevant exchange occurred on direct examination:

Q: What are you charged with in Delaware County?

A: Unauthorized writing and forgery.

Q: Do you have any sort of an agreement with the Delaware County authorities in return for your cooperation in this case?

A: No.

Q: Those charges are still open, correct?

A: Yes.

N.T. 6/9/09 at 334.

On cross-examination, the trial court permitted Appellant to question Mr. Johnson regarding his pending forgery charge. *See* N.T. 6/9/09 at 374–375. The relevant exchange occurred with regard thereto:

Q: Do you know that you're charged with having committed an act of forgery on February 13th, 2009?

A: Yes, I know. Before I was called up to the Court, [the ADA] asked me about the case in Delaware County. I told [the ADA] that I know that I had a warrant for my arrest in the computer system, and that was it. That's all I know. And he said that I was going to be—that they charged me with forgery. That was the first time today that I heard anything about it.

Q: Well, sir, isn't it true that the Delaware County detectives came and interviewed you at the Chester County Prison about this before you were charged?

A: Yes, they interviewed me. But they said it was another guy by the name of David Johnson running around cashing checks with a different address and a different birth date.

N.T. 6/9/09 at 374–75.

At this point, Appellant's counsel requested a sidebar, at which counsel stated the following:

Your Honor, I would like to cross-examine Mr. Johnson with the statement that he made to the Delaware County detectives in this case. What he just said to this jury is the police told him it was a different David Johnson and it wasn't him. He gave a recorded statement to the police in which he explains exactly what happened, how he cashed these checks as part of a check cashing scheme. And Johnson explains it in detail in the statement that I received in discovery.

Johnson was met by this guy at a check cashing place, said he would cash the check for me. Johnson said okay and went to the guy's house and gave him a check drawn on the Delaware County Treasurer's account. Johnson then cashed it. Johnson then received another check from the same guy and went to Lancaster.

N.T. 6/9/09 at 375–376.

■ Indicating that Appellant's counsel was improperly "getting into specific facts about the [forgery] case," the trial court denied the request to cross-examine Appellant regarding the statement he had given to the police in the pending forgery

case. N.T. 6/9/09 at 376. We find no abuse of discretion in this regard. *Davis, supra.* Simply put, after ensuring the jury was made aware of Mr. Johnson's pending forgery charge, the trial court properly exercised its discretion so as to avoid confusion of the issues, as well as prevent undue prejudice regarding an issue that was marginally relevant to Appellant's guilt. *See Bozyk, supra.*

■ As indicated *supra*, Appellant also claims the trial court improperly limited the cross-examination of Mr. Johnson concerning the fact he reaped the benefit of a plea bargain in an unrelated case, even though he did not meet all of the required conditions, *i.e.*, he failed a polygraph examination with regard to Mr. Jennings' murder.[4] Appellant invokes the legal principle that a witness may be cross-examined as to any matter tending to show the interest or bias of that witness. *See Nolen, supra.* According to Appellant, he should have been permitted to ask Mr. Johnson whether it was a condition of his plea agreement that he take and pass a polygraph examination concerning Mr. Jennings' murder, did he fail the examination, and if so, did he still reap the benefits of the plea agreement. Appellant's Brief at 31.

In *Commonwealth v. Sattazahn*, 597 Pa. 648, 952 A.2d 640 (2008), the post-conviction petitioner alleged his trial counsel was ineffective in failing to cross-examine his accomplice as to whether he failed a polygraph examination. In finding trial counsel was not ineffective, the Pennsylvania Supreme Court held:

> In *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), the United States Supreme Court upheld a *per se* ban on the admission of polygraph results in court martial proceedings based upon their inherent unreliability. *Scheffer* has been applied more broadly to support the exclusion of polygraph evidence, even in the capital context. *See, e.g., United States v. Fulks*, 454 F.3d 410, 434 (4th Cir.2006) (" '*Scheffer*, with its emphasis on the unreliability of polygraph evidence and the interest of courts in excluding such unreliable evidence, certainly suggests that exclusion of polygraph results would pass constitutional muster in th[e capital] context, as well.' ") (citation omitted). Particularly in light of the federal authority, [the petitioner] has provided no basis to undermine this Court's holdings precluding the admission of polygraph evidence. *See, e.g., [Commonwealth v.] Brockington*, 500 Pa. [216, 220], 455 A.2d [627, 629 (1983) ].

*Sattazahn*, 597 Pa. at 687, 952 A.2d at 663.

Under *Sattazahn*, we conclude the trial court did not err in limiting Appellant's cross-examination of Mr. Johnson to preclude the results of his polygraph examination. *See also Commonwealth v. Hetzel*, 822 A.2d 747 (Pa.Super.2003) (holding trial court did not err in precluding cross-examination of commonwealth witness regarding the results of her polygraph examination since "any reference to a [polygraph test] which raises an inference concerning the guilt or innocence of a defendant is inadmissible." (quotation, quotation marks, emphasis omitted)).

For all of the foregoing reasons, we affirm.

Affirmed.

---

4. We note the Commonwealth asserts Mr. Johnson's plea agreement was not conditioned upon him passing a polygraph examination. In any event, assuming, *arguendo*, Appellant's premise is correct that such was a condition, for the reasons discussed *infra*, we find no relief is due.