J-S26007-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RASHAUN PETERSON | |
| Appellant | No. 1773 EDA 2015 |

Appeal from the Judgment of Sentence May 18, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008630-2014

BEFORE:  OLSON, STABILE and STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED MAY 04, 2016**

Appellant, Rashaun Peterson, appeals from the judgment of sentence entered on May 18, 2015, following his jury convictions for first-degree murder, carrying a firearm on a public street in Philadelphia, and possessing an instrument of crime (PIC).[1]  Upon review, we affirm.

The trial court summarized the facts of this case as follows:

> On January 13, 2014, at or around 7:06 a.m.[,] police responded to a 911 call for a person with a gun on Chelton Avenue [in Philadelphia].  When [police] arrived at Chelton Avenue, a crowd was gathered near the corner at Chelton Avenue and Norwood Street, just a few feet from a neighborhood store known as Pretty Mary's.  At the center of the crowd, Aquil Bickerstaff lay on the sidewalk.  In Bickerstaff's stomach, Officer [Gilberto] Gutierrez observed holes, which he believed were from gunshots.  Bickerstaff

---

[1]  18 Pa.C.S.A. §§ 2502(a), 6108 and 907(a), respectively.


*Retired Senior Judge assigned to the Superior Court.

was later transported to Einstein Hospital where he was pronounced dead at 8:32 a.m. that same day.

According to Dr. Gary Collins, formerly the Deputy Chief Medical Examiner of the Philadelphia Medical Examiner's Office, Bickerstaff's death was a homicide caused by a gunshot wound to the upper left side of the abdomen. Bickerstaff had a total of three gunshot wounds to the abdomen, one gunshot wound to the left thigh, and one to the right hand.

Trial Court Opinion, 8/6/2015, at 2 (record citations and footnotes omitted).

Three witnesses, Rashaad Lewis, Michael James, and Madrigal Pitman gave statements to police regarding the shooting. Lewis told detectives that he saw Appellant and Bickerstaff arguing when Appellant retrieved a firearm from his grandmother's house nearby and returned to argue some more before shooting Bickerstaff four times. According to Lewis, Appellant began walking away but turned and shot Bickerstaff again as he lay on the ground. Lewis identified Appellant from photographs. James gave a similar statement to police and identified Appellant from a photo array. Pitman told police that she was with Bickerstaff, Appellant, and Aaron Peterson (Appellant's cousin) moments before Bickerstaff was shot. Pitman told police that the three men went around the corner and she heard four gunshots, and then several more shots after a brief pause. While fleeing the scene, Pitman heard Aaron Peterson ask Appellant why he shot the victim.

In addition, police recovered video surveillance from Pretty Mary's convenience store. Appellant and Bickerstaff are seen walking out of the camera's view toward the corner of Chelton Avenue and Norwood Street.

Aaron Peterson is seen walking in that same direction thirty seconds later. About one minute later, the surveillance video shows two males, with their backs to the camera, fleeing the scene and looking over their shoulders.

On April 30, 2014, police arrested Appellant. The Commonwealth charged him with the aforementioned crimes. On May 11, 2015, a jury trial commenced. The Commonwealth presented the evidence as recited above. Further, at trial, Lewis was questioned regarding his statements to police. Originally, Lewis told police that he could not identify the shooter, but later identified Appellant in a subsequent statement to police; he claimed he initially feared retaliation. Lewis also testified at trial that he did not remember several of his statements to police and claimed that several of his signatures on his statement "looked funny." The Commonwealth also presented evidence that approximately one month prior to the murder, on December 17, 2013, Officer Jason Tomon observed a box of Smith and Wesson .40-caliber ammunition next to the driver's seat of a vehicle Appellant was driving. In investigating the murder at issue, police recovered seven .40-caliber Smith and Wesson cartridge casings from the ground at the scene.

On May 18, 2015, the jury convicted Appellant of the previously mentioned crimes. On that same date, the trial court sentenced Appellant to life imprisonment without the possibility of parole for first-degree murder with concurrent terms of imprisonment of one to two years each for both

carrying a firearm on a public street in Philadelphia and PIC. This timely appeal resulted.[2]

On appeal, Appellant presents the following issues for our review:

    I.    Whether the evidence was sufficient to sustain the verdict?

    II.   Whether the court erred by admitting hearsay testimony from Madrigal Pitman regarding statements made by another at the time of the crime?

    III.  Whether the court erred by admitting hearsay testimony from Madrigal Pitman regarding statements made by [] Appellant's uncle, wherein the uncle relayed things allegedly stated by [] Appellant?

    IV.   Whether the court erred by ruling that evidence of Appellant's drug dealing would be admissible if [] Appellant introduced evidence that the decedent possessed drugs for sale?

Appellant's Brief at 4 (complete capitalization omitted).

In his first issue presented, Appellant "adamantly asserts that the evidence was insufficient, as a matter of law, to establish he was responsible for the crimes of [m]urder of the [f]irst[-d]egree, [c]arrying [f]irearm on the [p]ublic [s]treets in Philadelphia and [PIC]." *Id.* at 12. In sum, Appellant asserts:

---

[2] Appellant filed a notice of appeal on June 15, 2015. On June 16, 2015, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). After the grant of an extension, Appellant filed a timely concise statement on July 17, 2015. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on August 6, 2015.

> The evidence in the present case is unreliable, inconsistent and contradictory statements. No reasonable jury could find that the testimony of the witnesses was credible, given their horribly convoluted and contradictory statements. Without the direct evidence contained in Lewis' and James' statements to detectives, there would clearly not have been enough evidence to sustain a conviction. As such, the evidence in this matter was insufficient to sustain the verdict. Therefore, [Appellant's] convictions [] should be reversed.

*Id.* at 14.

We find Appellant waived this issue. "In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient." *Commonwealth v. Freeman*, 128 A.3d 1231, 1248 (Pa. Super. 2015) (citations omitted). "Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Id.* (citation omitted).

In his Rule 1925(b) statement, Appellant argued only that "[t]he evidence presented at trial was insufficient, as a matter of law, to support the verdict." Rule 1925(b) Statement, 7/17/2015, at 1. Appellant's Rule 1925(b) statement does not specify which element or elements of the relevant crimes, or even which crimes, the Commonwealth failed to prove beyond a reasonable doubt. Appellant's assertion was far too vague to

warrant meaningful review. Thus, Appellant has waived his challenge to the sufficiency of the evidence.

Moreover, Appellant's challenge goes to the credibility of the Commonwealth's witnesses, which actually implicates the weight, not the sufficiency of the evidence presented at trial. *See Commonwealth v. Yong*, 120 A.3d 299, 312 n.9 (Pa. Super. 2015). "[A] weight of the evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing." Pa.R.Crim.P. 607; *Commonwealth v. Griffin*, 65 A.3d 932, 938 (Pa. Super. 2013). "Failure to properly preserve the claim will result in waiver, even if the trial court addresses the issue in its opinion." *Griffin*, 65 A.3d at 938. Here, Appellant did not challenge the weight of the evidence by written motion or on the record prior to sentencing. For all of the foregoing reasons, Appellant waived his first claim.

In his second issue presented, Appellant argues the trial court erred by admitting hearsay testimony from Madrigal Pitman regarding statements she heard that were made by another at the time of the crime. Appellant's Brief at 14. More specifically, Appellant maintains it was error to permit Pitman to testify she heard someone she thought was "AP," or Aaron Peterson, say, "Why would you shoot Q, Rashaun?" *Id.* Appellant claims the statement did not qualify under the excited utterance or the present sense impression exceptions to the hearsay rule. *Id.* at 14-17. Appellant claims that in order to admit the hearsay statement, the Commonwealth needed to establish an

adequate foundation, or provide sufficient corroboration that Pitman or the declarant witnessed the event. *Id.* at 15-17. Appellant maintains that

> in addition to not seeing anything that occurred during the shooting, not seeing who made any alleged statements, not being sure who was speaking or what the circumstances were when the statement was made, Pitman could not even know who was still out in front of the store at the time the shooting occurred, because she had not seen the group of young men for significant period of time.

*Id.* at 15.

In his third issue presented, Appellant claims it was trial court error to allow Pitman to testify that Appellant's uncle told her that "when [Appellant] gets out [of prison], he's going to kill you." Appellant's Brief at 17. Appellant acknowledges that the trial court issued a cautionary instruction that the statement was not offered for the truth of the matter asserted, but was only to assist in the credibility of the witness. *Id.* However, Appellant argues that Pitman was "cooperative with the prosecution when she testified consistently with her statement to police." *Id.* at 18. Appellant asserts that Pitman never recanted and did not need to explain a change in her story, so her credibility was never at issue. *Id.* As such, Appellant claims the statement was not admissible as hearsay and "was not admissible for an alternative reason, such as credibility[.]" *Id.* Appellant claims the statement prejudiced him. *Id.*

In his fourth issue presented, Appellant contends the trial court erred by ruling that if Appellant introduced evidence that the decedent possessed drugs consistent with drug dealing, the Commonwealth could present evidence of Appellant's conduct involving drugs or drug sales. Appellant's Brief at 19. As a result, Appellant did not present evidence that the decedent possessed drugs, which he claims "effectively deprived [him] of a fair trial where he could offer evidence in his own defense" and "could [have] argue[d] that others had a motive to harm the decedent." *Id.* at 19-20.

This Court previously determined:

> our standard of review for evidentiary rulings is a narrow one: when we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party. A party suffers prejudice when the trial court's error could have affected the verdict.

*Commonwealth v. Tyack*, 128 A.3d 254, 257 (Pa. Super. 2015) (internal citation and brackets omitted).

We reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinion of the able trial court judge, the Honorable Barbara A. McDermott. The trial court determined that Aaron Peterson made his statement in a loud voice, close in time and proximity to the shooting, which showed it stemmed from the excitement of the shooting. The trial court also concluded that there was sufficient corroboration that

- 8 -

Aaron Peterson was the declarant based upon video surveillance, the testimony of James and Lewis, and because Pitman recognized Aaron Peterson's voice, having known him for approximately a year. Further, Judge McDermott determined it was proper to allow Pitman to testify regarding the statement by Appellant's uncle to explain why she failed to appear on the first scheduled trial date and subsequently gave a third statement to police. The trial court issued a cautionary instruction that the statement made by Appellant's uncle was to be used only to assess Pitman's credibility. Juries are presumed to follow court instructions. Finally, with regard to precluding evidence that the decedent possessed drugs for sale, the trial court noted that Pa.R.E. 404 allows for the introduction of evidence of a victim's pertinent trait, but the Commonwealth may rebut that evidence with evidence of a defendant's same trait. We conclude that there has been no error in this case and that Judge McDermott's opinion, entered on August 6, 2015, meticulously and accurately disposes of Appellant's remaining issues on appeal. Therefore, we affirm Appellant's last three issues as presented on appeal based upon the trial court's opinion and adopt it as our own. In any future filings with this or any other court addressing this ruling, the filing party shall attach a copy of the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/4/2016

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0008630-2014

v.

RASHAUN PETERSON

FILED

AUG 0 6 2015

Criminal Appeals Unit
First Judicial District of PA

## OPINION

McDermott, J.                                                    **August 6, 2015**

### Procedural History

On April 30, 2014, the Defendant, Rashaun Peterson, was arrested and charged with Murder, Firearms Not to be Carried Without a License, Carrying Firearms in Public in Philadelphia, and Possession of an Instrument of Crime ("PIC"). On May 11, 2015, the Defendant appeared before this Court and elected to be tried by a jury. On May 18, 2015, the jury returned verdicts of guilty for First-Degree Murder, Carrying Firearms in Public in Philadelphia, and PIC.[1]

On that same date, this Court sentenced the Defendant to a term of imprisonment of life without the possibility of parole for First-Degree Murder and concurrent terms imprisonment of one to two years for Carrying Firearms in Public in Philadelphia and one to two years for PIC.

On June 15, 2015, the Defendant filed a timely Notice of Appeal. On June 16, 2015, this Court ordered the Defendant to submit a Statement of Matters Complained of on Appeal pursuant Pa.R.A.P. 1925(b). On June 30, 2015, the Defendant filed a Motion for Extension of

---

[1] The remaining charge was *nolle prossed.*

Time to file a Concise Statement, which this Court granted on July 6, 2015. On July 17, 2015, the Defendant timely filed a Concise Statement of Matters Complained of on Appeal.

**Facts**

On January 13, 2014, at or around 7:06 a.m. police responded to a 911 call for a person with a gun on Chelten Avenue. When Officer Gilberto Gutierrez and Officer Achuff arrived at Chelten Avenue, a crowd was gathered near the corner at Chelten Avenue and Norwood Street, just a few feet from a neighborhood store known as Pretty Mary's. At the center of the crowd, Aquil Bickerstaff lay on the sidewalk. In Bickerstaff's stomach, Officer Gutierrez observed holes, which he believed were from gunshots. Bickerstaff was later transported to Einstein Hospital where he was pronounced dead at 8:32 a.m. that same day. N.T. 5/11/2015 at 41–55; N.T. 5/13/2015 at 11, 86.

According to Dr. Gary Collins, formerly the Deputy Chief Medical Examiner of the Philadelphia Medical Examiner's Office,[2] Bickerstaff's death was a homicide caused by a gunshot wound to the upper left side of the abdomen. Bickerstaff had a total of three gunshot wounds to the abdomen, one gunshot wound to the left thigh, and one to the right hand. N.T. 5/13/2015 at 89–102; Commonwealth's Exhibit C-93.

On the day Bickerstaff was shot, Rashaad Lewis worked the overnight shift at Pretty Mary's. On this same day, Lewis gave a statement to detectives in which he informed them that he had heard several gunshots while he was on Norwood Street. He then saw a male, whom he could not identify, run past. N.T. 5/11/2015 at 102–14.

On January 23, 2014, Lewis gave a second statement to detectives. Lewis informed detectives that the information he provided in his previous statement was not truthful. When asked by detectives why he did not tell the truth from the very beginning, Lewis revealed that he

---

[2] Dr. Collins is currently the Chief Medical Examiner for the Division of Forensic Science for the State of Delaware.

was scared and that "[a]ny given minute they can slide right down on [him]." *Id.* at 91–101; N.T. 5/12/2015 (Vol. 1) at 7–13, 29–30; N.T. 5/14/2015 at 55–75.

Lewis went on to tell detectives that immediately before the shooting, Bickerstaff and the Defendant were arguing about a video basketball game on Chelten Avenue in front of Pretty Mary's; then, a woman walked past and they began to argue about her. During the argument, the Defendant retrieved a black and silver automatic firearm from his grandmother's house.[3] When the Defendant returned, he cocked the gun back and said to Bickerstaff, "say that shit now." N.T. 5/12/2015 (Vol. 1) at 14–20; N.T. 5/14/2015 at 55–75.

Although Lewis tried to stop him, the Defendant pushed past him and kept arguing with Bickerstaff. The Defendant then said to Bickerstaff, "Come off camera," then shot him.[4] The Defendant first shot Bickerstaff four times; after he started to walk away, however, he turned around and shot Bickerstaff again as Bickerstaff lay on the ground. N.T. 5/12/2015 (Vol. 1) at 14–20; N.T. 5/14/2015 at 55–75.

Along with his statement to detectives on January 23, Lewis also reviewed and identified photographs of the Defendant and of Aaron Peterson, a relative of the Defendant. With regard to Aaron Peterson's photograph, Lewis stated "[t]hat's A, Aaron. I can vouch for him. He was trying to save [Bickerstaff]." N.T. 5/12/2015 (Vol. 1) at 21–29.

Despite the fact that Lewis informed detectives on January 23 that he was now telling the truth, at trial Lewis claimed that he did not remember a number of the items in his statement. He also testified that the signatures on each page of the statement looked funny. He agreed, however, that the signatures on pages seven and eight of the January 23 statement were in fact

---

[3] The Defendant's Grandmother's house was approximately twenty feet from the corner of Chelten Avenue and Norwood Street. N.T. 5/14/2015 at 64.
[4] Lewis clarified for detectives that the camera the Defendant referenced was the surveillance camera outside Pretty Mary's on Chelten Avenue. N.T. 5/12/2015 (Vol. 1) at 14–20.

3

his, but that he did not remember signing them. He did, though, remember going to the Homicide Unit on January 23 and talking with detectives about the shooting. He also remembered detectives typing his answers as he spoke with them. He further testified that he remembered detectives printing out his statement and allowing him to read it over. At trial, Detective William Sierra, who was present during Lewis' January 23 interview, testified that Lewis voluntarily gave all the answers in his statement. N.T. 5/11/2015 at 81–101; N.T. 5/12/2015 (Vol. 1) at 7–12, 30; N.T. 5/14/2015 at 55–75.

A second witness, Michael James, stood at the corner of Chelten Avenue and Beechwood Street, approximately six car lengths away from Bickerstaff and the Defendant, when they began to argue. He witnessed the Defendant waving to Bickerstaff, telling him to come around the corner. James next heard gunshots and then saw Bickerstaff fall to the ground. James testified that the Defendant continued to fire while Bickerstaff lay on the ground. He also added that he did not see anyone else on the street with a gun at the time the Defendant was shooting. N.T. 5/12/2015 (Vol. 2) at 11–20, 36.

On April 17, 2014, James gave a statement to police and identified the Defendant from a photographic array. James also identified photographs of Lewis and Aaron Peterson and indicated that they were present at the time of the shooting. *Id.* at 21–36.

Madrigal Pitman testified that she last saw Bickerstaff a little before 7:00 a.m., on Chelten Avenue in front of Pretty Mary's. There, Pitman and Bickerstaff spoke briefly about getting breakfast together. She testified that while she spoke with Bickerstaff, Aaron Peterson and the Defendant, whom she had known for about a year, were standing nearby. After speaking with Bickerstaff, Pitman and another woman, by the name of Nike, began walking toward the corner store on Chelten Avenue and Beechwood Street, which was diagonally across the street

4

from Pretty Mary's. As Pitman walked, she and the Defendant had a verbal exchange, where the Defendant accused her of being a confidential informant. Pitman responded by telling the Defendant to go "eff himself." *Id.* at 119–34, 178–83.

A few minutes later, after leaving the corner store, Pitman stood on Beechwood Street, about twenty feet from the corner of Chelten Avenue. There, she heard four gunshots; after a brief pause, she heard several more. Once Pitman heard the fifth shot, she sprinted north on Beechwood Street onto the front porch of a home. About thirty seconds after she heard the gunshots, Pitman heard a voice shouting, "[w]hy would you shoot Q,[5] Rashaun? Why did you shoot him?" Pitman recognized the voice as Aaron Peterson's. *Id.* at 116–34, 178–83.

On January 16, 2014, detectives interviewed Pitman. During her interview, she reviewed photographs and identified the Defendant, Aaron Peterson, and Lewis. On January 17, 2014, detectives interviewed Pitman a second time. This time, she reviewed a still photograph generated from a video recovered from a surveillance camera outside Pretty Mary's. From the still photograph, she identified the Defendant, Aaron Peterson, Lewis, and Bickerstaff as they stood on Chelten Avenue outside Pretty Mary's at 7:00 a.m., just a few minutes before the shooting. N.T. 5/12/2015 (Vol. 2) at 134–48, 166, 196; N.T. 5/14/2015 at 45–47; Commonwealth Exhibit C-84.[6]

From the surveillance video in front of Pretty Mary's, at 7:03 a.m., approximately three minutes before police responded to a call for a person with a gun on Chelten Avenue, the Defendant and Bickerstaff are seen walking out of the camera's view toward the corner of Chelten Avenue and Norwood Street. Approximately thirty seconds later, Aaron Peterson

---

[5] Aquil Bickerstaff was also known as "Q." N.T. 5/11/2015 at 78.
[6] Although the clock on the still photograph indicates that the time was 7:35:29, Detective Dunlap testified that the surveillance video was thirty-five minutes and twenty-eight seconds fast. N.T. 5/13/2015 at 180–83; Commonwealth Exhibit C-84.

walked with others toward the same corner. About one minute later, at 7:04 a.m., the surveillance video shows two males, looking back over their shoulders, running away from the corner of Chelten Avenue and Norwood Street. Commonwealth Exhibit C-97.

On the day of the shooting, Officer Craig Perry of the Crime Scene Unit observed eight fired cartridge casings ("FCCs") at Chelten Avenue and Norwood Street, seven of which were recovered.[7] Officer Norman DeFields, of the Firearm Identification Unit, an expert in firearm identification, testified that all seven of the recovered FCCs were .40-caliber Smith and Wesson, and were fired from the same gun. N.T. 5/13/2015 at 41, 147, 150.

On December 17, 2013, less than a month before Bickerstaff's murder, Officer Jason Tomon pulled alongside the Defendant who was in a parked white mini-van with three other individuals. When police pulled up, the Defendant exited from the driver-side of the vehicle. In the vehicle, next to the driver's seat, Officer Tomon observed a white paper bag with a new pair of jeans and a box of Smith and Wesson .40-caliber ammunition. *Id.* at 165–68.

## Issues

On appeal, the Defendant raises four issues: (1) the Defendant challenges the sufficiency of evidence for his convictions of First-Degree Murder, Carrying a Firearm in Public in Philadelphia, and PIC; (2) the Defendant alleges that this Court erred in allowing hearsay testimony from witnesses, as to statements these witnesses heard others make at the time of the subject crime; (3) the Defendant alleges that this Court erred in allowing hearsay testimony from a witness, as to statements made by another as to things the Defendant allegedly said; and (4) the Defendant alleges that this Court erred in ruling that the Commonwealth could introduce evidence of the Defendant's drug possession or drug dealing if the Defendant introduced

---

[7] Officer Perry testified that when he attempted to recover one of the FCCs it fell into a sewer and was lost. N.T. 5/13/2015 at 41–42.

6

evidence of the decedent's drug dealing, as that evidence went to motive of others to shoot the decedent.

This Court interprets the first, second, and third issues in the Defendant's Concise Statement to be vague and insufficiently addressed. Thus, these issues are deemed waived.[8] Though the first issue is deemed waived, it will be addressed herein for future reference. Though the second issue is deemed waived, it will also be addressed herein for future reference as this Court has determined that the Defendant is most likely objecting to the testimony of Pitman as to what she heard Aaron Peterson shout following the shooting. Though the third issue is also deemed waived, it, too, will be addressed herein for future reference as this Court has determined that the Defendant is most likely objecting to the testimony of Pitman as to threats made to her by the Defendant's uncle.

## Sufficiency of the Evidence

The Defendant, without providing any basis, claims that the evidence was insufficient for First-Degree Murder, Carrying a Firearm in Public in Philadelphia, and PIC. Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008). The Commonwealth may sustain its burden of proving each element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011) (*citing Commonwealth v. Brooks*, 7 A.3d 852, 856–57 (Pa. Super. 2010)). The fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder.

---

[8] A Concise Statement of Matters Complained of on Appeal that is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all. *Commonwealth v. Dowling*, 778 A.2d 683, 687–88 (Pa. Super. 2001).

*Commonwealth v. Treiber*, 874 A.2d 26, 30 (Pa. 2005). The Superior Court considers all the evidence admitted, without regard to any claim of wrongly admitted evidence. *Commonwealth v. Kane*, 10 A.3d 327, 332 (Pa. Super. 2010). The Superior Court will also not weigh the evidence or make credibility determinations. *Id.*

First-Degree Murder is any unlawful killing committed with malice and the specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Johnson*, 42 A.3d 1017, 1025 (Pa. 2012). Malice is defined as:

> A wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

*Commonwealth v. Dunphy*, 20 A.3d 1215, 1219 (Pa. Super. 2011) (*citing Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. 1995). Malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Thomas*, 54 A.3d 332, 335–36 (Pa. 2012).

Evidence is sufficient to sustain a conviction for First-Degree Murder when the Commonwealth establishes that: (1) a human being was unlawfully killed; (2) the accused is responsible for the killing; and (3) the accused acted with specific intent. 18 Pa.C.S. § 2502(a); *Commonwealth v. Chambers*, 980 A.2d 35, 44 (Pa. 2009). The Commonwealth may establish that a defendant intentionally killed the victim wholly through circumstantial evidence. *Id.* (*citing Commonwealth v. Rivera*, 773 A.2d 131, 135 (Pa. 2001)). Specific intent may also be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011) (*citing Commonwealth v. Smith*, 985 A.2d 886, 895 (Pa. 2009)).

8

In the case at bar, sufficient evidence established that the Defendant, with the specific intent to kill, murdered Bickerstaff. Former Deputy Chief Medical Examiner, Dr. Collins, testified that Bickerstaff's death was a homicide caused by a gunshot wound to the upper left side of the abdomen. N.T. 5/13/2015 at 89–102; *see also* Commonwealth's Exhibit C-93.

Two witnesses, Lewis and James, identified the Defendant as the shooter. Lewis' January statement not only identified the Defendant as the shooter, but also gave a detailed description of the shooting and of the events that led up to it.[9] By their verdict, the jury chose to believe Lewis' January 23 statement rather than his January 13 statement or his in-court repudiation. As noted above, credibility determinations are within the sole province of the jury to resolve in its role as the fact-finder. *See Treiber* and *Kane, supra.*

In addition, James' testimony corroborated Lewis' January 23 statement. James testified that he also witnessed the Defendant and Bickerstaff arguing and then saw the Defendant shoot Bickerstaff. Like Lewis' statement, James testified that the Defendant continued to fire after Bickerstaff fell to the ground. N.T. 5/12/2015 (Vol. 2) at 11–20.

Pitman's testimony also corroborated the eyewitness accounts that the Defendant shot the victim. Immediately following the gunshot, Pitman testified that she heard Aaron Peterson asking the Defendant—by name—why he shot Bickerstaff. *Id.* at 130–34, 178–83. In addition to eyewitness accounts identifying the Defendant as the shooter, the evidence also showed that the Defendant had access to the same caliber ammunition used to kill Bickerstaff. N.T. 5/13/2015 at 41, 147, 150, 165–68.

In total, three shots fired by the Defendant struck Bickerstaff in the abdomen, a vital body part. *Id.* at 89–102; Commonwealth's Exhibit C-93. The specific intent to kill as well as the

---

[9] Although Lewis repudiated much of his January 23 statement at trial, the statement was still admissible as substantive evidence. *See Commonwealth v. Lively*, 610 A.2d 7 (Pa. 1992); *Commonwealth v. Brady*, 507 A.2d 66 (Pa. 1986).

requisite malice for First-Degree Murder can be inferred from the Defendant's use of a deadly weapon upon a vital body part. *See Thomas, supra.* The large volume of shots fired by the Defendant, and the fact that he continued to fire at Bickerstaff while he lay on the ground, further evidences that the Defendant had the specific intent and requisite malice for First-Degree Murder. Thus, the evidence was more than sufficient to establish that the Defendant shot Bickerstaff with the specific intent and requisite malice for First-Degree Murder.

To secure a conviction for PIC, the Commonwealth must show that a defendant possessed an instrument of crime with the intent to employ it criminally. 18 Pa.C.S. § 907(a). An instrument of crime is "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S. § 907(d)(2); *see also Commonwealth v. Robertson*, 874 A.2d 1200, 1208–09 (Pa. Super. 2005). Instantly, the Defendant retrieved a firearm from his grandmother's home, requested Bickerstaff to walk off camera, and shot him. N.T. 5/12/2015 (Vol. 1) at 14–20. As discussed *supra*, the Defendant employed the firearm in the commission of a murder. The evidence was thus sufficient to establish that the Defendant's possessed an instrument with the intent to employ it criminally.

The Defendant also challenges his conviction for Carrying a Firearm in Public in Philadelphia. In Philadelphia, "no person shall carry a firearm, rifle, or shotgun at any time upon the public streets or upon any public property in a city of the first class unless such person is licensed to carry a firearm." 18 Pa.C.S.A. § 6108. Lewis saw the Defendant with a black and silver automatic handgun when the Defendant came off the steps of his grandmother's house. N.T. 5/12/2015 (Vol. 1) at 14–20. Further, both Lewis and James witnessed the Defendant shoot Bickerstaff. *Id.*; N.T. 5/12/2015 (Vol. 2) at 11–20. The certificate of non-licensure submitted by

10

the Commonwealth conclusively established that the Defendant was not eligible to carry a firearm at the time of the shooting. N.T. 5/15/2015 at 17. Thus, the evidence is more than sufficient to establish that the defendant carried a firearm in public without a license.

**Hearsay Statements**

After a review of the record, this Court has determined that the Defendant's second claim of error challenges the admission of Pitman's testimony as to what she heard another say immediately following the shooting. About thirty seconds after she heard the gunshots, Pitman heard a voice shout, "[w]hy would you shoot Q, Rashaun? Why did you shoot him?" N.T. 5/12/2015 (Vol. 2) at 181. Pitman testified that the voice she heard was Aaron Peterson's. *Id.* at 177–81. This Court admitted the statement as an excited utterance and as a present sense impression.

Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied; or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record. *Commonwealth v. Handfield,* 34 A.3d 187, 207–08 (Pa. Super. 2011) (*citing Commonwealth v. Cain,* 29 A.3d 3, 6 (Pa. Super. 2011).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). An excited utterance, an exception to the hearsay rule, is a

> spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and

11

place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties. . . . Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.

*Commonwealth v. Stokes*, 615 A.2d 704, 712 (Pa. 1992). An excited utterance also "need not describe or explain the startling event or condition; it need only *relate* to it." Pa.R.E., Rule 803(2) cmt. (emphasis original). Witnessing a shooting is sufficient as a startling event or condition. *See e.g., Commonwealth v. Hood*, 872 A.2d 175 (Pa. Super. 2005) (finding where witnesses made a 911 call and described a shooting, the shooting was sufficient as a startling event or condition). Further, there is no clearly defined time limit within which the statement must be made after the startling event; the determination is factually driven, made on a case-by-case basis. *Commonwealth v. Wholaver*, 989 A.2d 883, 906–07 (Pa. 2010) (*see e.g., Commonwealth v. Douglas*, 737 A.2d 1188 (Pa. 1999) (holding that statements made eleven minutes after a shooting were admissible).

In the instant case, Pitman heard Aaron Peterson, a man whom she had known for about year, shout the statement from a block away after the shooting. A shout with such volume— made almost immediately after the sound of gunfire—is an indication that it stemmed from the emotion or stress of excitement created by the shooting.

The evidence also sufficiently corroborated that Aaron Peterson was most likely the declarant. Both Lewis and James placed Aaron Peterson near the corner of Chelten Avenue and Norwood Street at the time of the shooting. N.T. 5/12/2015 (Vol. 1) at 21–36; N.T. 5/12/2015 (Vol. 2) at 14–20. Moreover, the surveillance video showed Aaron Peterson walking toward the corner of Chelten Avenue and Norwood Street approximately one minute before the shooting occurred. Commonwealth Exhibit 97.

12

Lewis also informed detectives that Aaron Peterson was trying to save Bickerstaff. N.T. 5/12/2015 (Vol. 1) at 21–24. That Aaron Peterson was trying to save Bickerstaff shows that he was not only present at the time of the shooting, but that he also "participated in or closely witnessed" the event he was commenting on. *Harris v. Toys "R" Us-Penn, Inc.*, 880 A.2d 1270,1279 (Pa. Super. 2005).

In addition to the evidence placing Aaron Peterson near the shooting at the corner of Chelten Avenue and Norwood Street, the evidence also showed that the person whom the shout was directed at was also present at the shooting scene. Both Lewis and James not only placed the Defendant at the shooting scene, but also identified him as the shooter. N.T. 5/12/2015 (Vol. 1) at 14–20; N.T. 5/12/2015 (Vol. 2) at 11–20. Thus, these facts sufficiently corroborate that Aaron Peterson viewed the events in which his shout referenced.

Aaron Peterson's statement was also admissible under the present sense impression exception to the hearsay rule. A present sense impression is a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it. Pa.R.E., Rule 803(1). A present sense impression, however, need not expressly describe the events the declarant witnessed. *See Commonwealth v. Harper*, 614 A.2d 1180 (Pa. Super. 1992) (holding that a statement of "[t]hose are my boyfriend's socks laying on that bed" after immediately observing them was a present sense impression as the statement was a contemporaneous verbalization of the declarant having observed the socks through a window).

A present sense impression's observation "must be made at the time of the event or shortly thereafter, making it unlikely that the declarant had the opportunity to form an intent to misstate his observation. Consequently, the trustworthiness of the statement depends upon the timing of the declaration." *Hood*, 872 A.2d at 183. A present sense impression statement,

13

however, need not be made simultaneously with the event in which it describes; rather, near contemporaneousness will suffice. Pa.R.E., Rule 803(1). cmt.

In the case at bar, Aaron Peterson's shout was a contemporaneous verbalization made thirty seconds after observing the Defendant shooting Bickerstaff. As discussed *supra*, the evidence shows that the shout was reliable as Aaron Peterson was present at the time of the shooting and was commenting on an event he almost certainly witnessed. Thus, Pitman's testimony as to what she heard Aaron Peterson shout following the shooting was properly admitted.

After a review of the record, this Court has determined that the Defendant's third claim challenges the admission of Pitman's testimony regarding threats made to her by the Defendant's uncle. At trial, when the Commonwealth questioned Pitman on why she failed to appear at the first scheduled trial date and on the circumstances under which she gave her third statement to police, the following exchange took place:

> COMMONWEALTH: Did you go to – well, were you asked to come to court previously?
>
> PITMAN: I was. The first time it was supposed to go to trial and I did not show due to some people trying to bribe me not to testify. And I was in somebody's car the night before, and I heard somebody walk by and they – excuse my language, Your Honor – once that white bitch comes to court, she's never leaving. So I didn't want to come. I have five kids at home. I don't want to risk my life for this.
>
> . . .
>
> COMMONWEALTH: Did you at some point report to Detective Sierra that you were having problems?
>
> PITMAN: Right after I had my son I called him, and I asked him to come down to my mom's house because two members of the defendant's family had bribed me with $50 and an eight ball of crack to recant my statement.

14

COMMONWEALTH: And did you tell Detective Sierra that? Did he take an interview from you?

PITMAN: Yes. He came, he didn't type it, he wrote everything, so we had to go over it a few times, but I told him it was [the Defendant's] uncle and another family member who were both trying to have me meet with the [D]efendant's lawyer to recant, and if I did meet with detectives, recant, and overall, I would be paid $500 and an eight ball.

. . .

COMMONWEALTH: And did anyone else speak to you?

PITMAN: One of [the Defendant's] uncles – one of his other uncles told me that when he gets out he's going to kill me.

COMMONWEALTH: What is the other person's name?

DEFENSE COUNSEL: I have an objection to that.

THE COURT: Lay a better foundation.

COMMONWEALTH: When –

DEFENSE COUNSEL: Just before – my objection would be to hearsay – of blatant hearsay, and I think you should strike it and instruct the jury she just testified what somebody else said to my client.

THE COURT: No. I thought it was what he said to her. Did I miss something?

PITMAN: Kenny Peterson directly told me, when Rashaun gets out, he is going to kill you.

THE COURT: Who is "he"? Rashaun is going to kill?

PITMAN: Yes.

THE COURT: Ladies and gentlemen [of the jury], once again, I'm not going to strike it from the record, but I'm going to instruct you that, clearly, that is not offered for the truth of the matter, nor can you in any way conclude that that's the truth of the matter. This is being offered to suggest or to offer it as an explanation to assist

15

you in your assessment of the credibility of the witness. It is not offered for the truth of the matter.

N.T. 5/12/2015 (Vol. 2) at 169–73.

This testimony was elicited to assist the jury in weighing Pitman's credibility and the truthfulness of her testimony. Courts have held that testimony regarding threats to a witness may be admissible to assist the jury in assessing a witness's credibility. In *Commonwealth v. Martin*, for example, the Superior Court explained that although threats made by third parties against witnesses are not relevant to prove an accused's guilt, the Commonwealth may introduce evidence of threats made against a witness to explain the witness' prior inconsistent statements. 515 A.2d 18, 21 (Pa. Super. 1986); *see also Commonwealth v. Carr*, 259 A.2d 165, 167 (Pa. 1969). In *Commonwealth v. Bryant*, a witness revealed his subjective fear that appellant or appellant's family *might* threaten him or his family if he testified against appellant. 462 A.2d 785, 788 (Pa. Super. 1983). There, the testimony was properly admitted to reconcile the inconsistencies in the witness's pretrial and at-trial statements. *Id.*

Similarly, in *Commonwealth v. Brewington*, the court properly admitted questioning that showed appellant had access to a witness when the two were incarcerated together prior to trial. 740 A.2d 247, 256 (Pa. Super. 1999). There, the court held that, although no evidence showed that the appellant had threatened the witness, the evidence that the witness and the appellant were incarcerated together was admissible to explain the change in the witness's testimony by the possibility of the witness being threatened or coerced by appellant. *Id.*; *see also Martin*, 515 A.2d at 21 (finding that counsel was not ineffective for failing to object when a witness explained that she changed her testimony because she had been threatened by appellant's friends).

16

Here, Pitman's testimony that she had been threatened was properly admitted as the testimony was not offered for its truth or to prove the Defendant's guilt. Rather, the testimony was offered to assist the jury in assessing Pitman's credibility as a witness and to provide an explanation as to why she gave a third statement to detectives and why she failed to appear at a scheduled trial date. This Court immediately instructed the jury that the evidence was to be considered for the sole purpose of assessing the witness's credibility and was not offered for the truth of the matter asserted. N.T. 5/12/2015 (Vol. 2) at 172–73. The law presumes that the jury will follow a court's instructions. *See Commonwealth v. Spotz*, 896 A.2d 1191, 1224 (Pa. 2006).

## Evidence of the Defendant's Drug Dealing

The Defendant alleges that this Court erred in ruling that the Commonwealth could introduce evidence of the Defendant's drug possession or drug dealing if the Defendant introduced evidence of the decedent's drug dealing, as that evidence went to motive of others to shoot the decedent.

By way of background, on March 2, 2015, the Defendant moved to exclude evidence of the Defendant's drug dealing, which this Court granted. That same day, the Commonwealth moved to preclude the Defendant from mentioning that drugs were found on the victim's body. This Court held that motion under advisement. At trial, this Court instructed the Defendant that he was permitted to introduce evidence of the victim's alleged drug dealing to show possible motive of another to commit the crime. But, based on the evidence at trial, this Court determined that the Defendant was also in that pool of people who may have had a drug-related motive to kill the decedent. Thus, if the Defendant introduced evidence of the decedent's drug dealing, the

17

Commonwealth was permitted to introduce similar evidence of the Defendant. N.T. 5/11/2015 15–18; N.T. 5/13/2015 at 109–19.

As noted above, admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. *See Handfield, supra.* In Pennsylvania, a defendant may offer evidence of a victim's pertinent trait. Pa.R.E., Rule 404(a)(2)(B). If such evidence is admitted, however, the Commonwealth may: "(i) offer evidence to rebut it; and (ii) offer evidence of the defendant's *same* trait." Pa.R.E., Rule 404(a)(2)(B)(ii) (emphasis added). Accordingly, the Defendant's claim is meritless as this Court acted in accordance with the rules of evidence.

For the foregoing reasons, the Defendant's judgment of sentence should be affirmed.

BY THE COURT,

_____
Barbara A. McDermott, J.

18